# REPORTS

OF

# CRIMINAL LAW CASES.

## SUPREME COURT.

### PHILADELPHIA, AUGUST, 1823.

The Commonwealth, (at the instance of Edward Short,)
vs.
I. Deacon, Keeper of the Prison of the City and County of Philadelphia.

> HABEAS CORPUS.

THIS case was fully argued in the Supreme Court room, before Chief Justice Tilghman, on the 11th and 14th instant. Messrs. C. J. Ingersoll and C. S. Coxe, for the prosecution, and Messrs. P. A. Brown and Keating for the defendant. On the 21st inst. the Chief Justice delivered the following decision :

TILGHMAN, C. J. It appears by the return to the habeas corpus, in this case, that Edward Short is detained, by virtue of a warrant of commitment, issued by Joshua Raybold, a justice of the peace, founded on the oath of John Wallace; by which Short is charged with the murder of James Trimble, in the county of Tyrone, in Ireland, and afterwards flying from justice. The murder is alleged to have been committed on or about the 26th of July, 1821. John Wallace and other witnesses have

Vol. II.                    1

PHILAD'A. been examined before me, and the cause has been well ar-
August, 1823. gued by counsel both for and against the prosecution.

The Com'th Two questions are to be considered : 1st. Whether the
v. evidence is such as would warrant a commitment for trial
Deacon. for murder, if the offence had been committed in Penn-
sylvania. 2d. Supposing the evidence sufficient, whether
the warrant of commitment was legal ?

I am by no means satisfied with the evidence. It
proves, that about the 26th of July, 1821, there was an
affray, at the town of Clogher, in the county of Tyrone,
in Ireland, in which James Trimble received one or more
violent blows on the head, by which his skull was frac-
tured, and in consequence of which he died in a short
time. An inquest was held on his body, but no copy of
it having been produced, we are ignorant of the finding of
the jury. A reward was offered by private persons, for the
apprehension of Short, who fled, and could not be taken.
Since his arrival in this country, he has confessed that
he was in the affray, but denied that he was guilty of
murder. Now, supposing that a homicide of some kind
was committed, we are quite ignorant of its nature.
And I think it might have been expected, that a copy of
the coroner's inquest should have been produced. I cer-
tainly should have called for it had the offence been
committed in Pennsylvania. On the whole, then, I should
have inclined against the commitment for murder, had
the case rested solely on the evidence. But a much more
important question remains :—Ought the prisoner to have
been committed, even if the evidence had been sufficient ?
He was arrested at the request of a private person, with-
out the interference either of the British government, or
that of the United States. It is a question in which the

peace of many persons is deeply concerned—persons who have fled from Europe, and sought an asylum in this country, where they thought themselves sure of protection.

The counsel for the prosecution have rested their case upon the law of nations; by which, as they contend, the government within whose territory any offence has been committed, has an absolute and perfect right to demand the person of the criminal, to be delivered up, by the government in whose dominions he shall be found. In support of this proposition, they rely on the opinions of respectable authors, the practice of nations, and judicial decisions. It is proper, therefore, that each of these grounds should be examined.

Grotius is of opinion, that when a criminal has fled from justice, the government to which he flies is bound either to punish him according to his crime, or force him to leave the country, or deliver him up. This he lays down in broad terms, without distinction as to the magnitude of the crime. Yet he confesses, that for some ages past, the right of demanding fugitive delinquents has not been insisted on in most parts of Europe, "except in crimes against the state, or those of a very heinous nature. As for lesser faults, they are connived at, on both sides, unless it is otherwise agreed on by some particular treaty." (Grot. book 2. ch. 20. sect. 3, 4, 5, 6.) Burlemaqui follows the opinion of Grotius, verbatim. He adds, however, that Puffendorf is of different sentiments, "who pretends, that if we are obliged to deliver up a criminal who takes shelter among us, it is rather in virtue of some treaty, than in conse-

quence of a common and indispensable obligation." (2 Burl. part 4. sect. 23, 24, 25, 26, 27, 28.) The opinion of Grotius is adopted also by Heincius, in his prelut in Grot. Vattel seems to have directed his attention principally to the case of sovereigns whose subjects have committed crimes within the dominions of others. And he is of opinion, that the offenders should either be punished at home, or delivered up. He does say, however, in general, "that the practice of delivering up is pretty generally observed with respect to great crimes, which are equally contrary to the laws and safety of all nations;" and that "assassins, incendiaries, and robbers, are seized every where, at the desire of the sovereigns in whose territories the crime was committed, and delivered up to justice." (Vatt. book 2. ch. 6. sect. 71—77.) These are the opinions in support of the absolute and positive duty to deliver up the offender, upon the demand of the sovereign in whose territory the crime was committed. But we shall find, that it is a point on which all authors have not agreed. There are great names on both sides. We have seen that Puffendorf, as quoted by Burlemaqui, founds the right of demanding a delivery of the offender on treaty. Martens is of opinion, that a sovereign may punish foreigners, whether they commit a crime in his dominions, or fly to them, having committed a crime in the dominions of another; "but in neither case is he perfectly obliged to send them for punishment to their own country, nor to the place where the crime was committed; not even supposing them to have been condemned before their escape." He adds, however, "that the general good seems to require, that those who attack immediately the safety of the state should not go unpunished; and, ac-

cordingly, in case of requisition, no sovereign refuses,
directly, to take cognizance of such a crime." · (Martens,
book 2. ch. 3. sect. 22. p. 107. Philadelphia edition.)
Lord Coke, (3 Inst. p. 180.) is strong and positive
against delivering up. "It is holden, (says he) and so
it hath been resolved, that divided kingdoms under se-
veral kings, in league one with another, are sanctuaries
for servants, or subjects, flying for safety from one king-
dom to another; and upon demand made by them, are
not, by the laws and liberties of kingdoms, to be deli-
vered; and this same hold is grounded upon the law
in Deuteronomy, non trodes servur domino suo, qui ad
to configuerit." Coke cites no case in which the point
had been adjudged; but he mentions three memorable in-
stances, which show the opinions and practice of the
sovereigns of that day. Queen Elizabeth, in the 34th
year of her reign, demanded of the French king (the
great Henry 4th) Morgan and others of her subjects,
who had committed treason against her. The answer of
the king was, "that if these persons had machinated
any thing against the queen in France, he could lawfully ·
proceed against them, but, if the offence was committed
in England, he had no right to take cognizance of it.
That all kingdoms were free to fugitives, and it was the
duty of kings to defend the liberties of every one in his
own kingdom, and that Elizabeth herself had, not long
before, received into her kingdom, Montgomery, the
prince of Conde, and other Frenchmen," &c. &c.; and
so, says Lord Coke, the matter rested. The 2d instance
was, the demand made by Henry VIII. of England, of the
king of France, to deliver up to him the cardinal Pool,
being his subject, and attainted of treason. This demand
was not complied with, though it must have been well

considered, since Henry had a treatise written in support of his claim. The third was the case of the earl of Suffolk, attainted of high treason by parliament, and demanded by Henry VII. of England, of Ferdinand, king of Spain. Ferdinand refused to deliver him; but was afterwards induced to do so, in consequence of the promise of Henry not to put the earl of Suffolk to death. This promise was basely violated by Henry, who, affecting to consider it as only personal, commanded his son, Henry VIII. to execute the earl after his decease, who as basely carried this command into effect, in the fifth year of his reign.

These are the cases mentioned by Lord Coke; to which he might have added that of Perkin Warback, an impostor, who contended with Henry VII., for the throne of England; and having fled to Scotland, was protected by the king of that country, against Henry VII., who demanded him. In opposition to the opinion of lord Coke has been cited a treatise by Mr. Wynne, entitled, "Eunomus," (Dialogue 3. sect. 67. p. 317.) In this treatise the author makes very free with the judge's opinion: he remarks, that Coke says, "it is holden," &c. "so it hath been resolved," but neither tells us when or where it was resolved, and that his examples from history are far from proving the point. Although lord Coke was as great a common lawyer as England ever produced, yet certainly he was not equally profound in his knowledge of equity, or the law of nations. Perhaps, indeed, his attachment to the common law gave him a prejudice against all others. Yet, when he says a matter has been resolved, I should think he might be relied on; for he certainly was not apt to speak without book.

It may be remarked, by the by, that Mr. Wynne does not seem to have been in all respects master of the law of nations. For in his argument against lord Coke's opinion, we find the following passage: " If a criminal flies from his own, to another state, for refuge, his own cannot seize him by evidence. The case, in this respect, is much the same as (though stronger than) that of pursuing an enemy's ship under the protection of a neutral port. In both cases your are first to apply to the justice of the country : if that is refused, you may resort to war, at your option." This would be. reckoned strange doctrine at the present day. The marquis of Beccaria gives no direct opinion as to the right of a sovereign to demand the delivery of a fugitive ; but from the whole scope and spirit of his thoughts, it is plainly to be seen that he was against it. (Beccaria, ch. 35. p. 134) Ward, in his treatise on the law of nations, seems to rest the matter on treatise or conventions.

I will now take notice of what may be called objected cases ; and they are but few. Col. Lundy's case, in the first year of William and Mary, is in 2 Vez. 314. Colonel Lundy committed a capital offence in Ireland, and fled to Scotland, where he was arrested and sent to England. The judges were consulted, and all agreed that he might be sent to Ireland for trial. The King vs. Kimberby is reported in 2 Str. 848. 1 Barnard. (K. B.) 225. and Fitz. 111. Kimberby committed a capital felony in Ireland, and having fled to England, was arrested on a warrant of a justice of the Peace, and on a habeas corpus the Court of King's Bench refused to bail him. He was sent to Ireland by virtue of a warrant from the secretary of state. In the case of the East India Com-

pany against Campbel (1 Vez. 246.) it was said by the Court of Exchequer, that one may be sent from England to Calcutta to be tried for an offence committed there. The principal of these three cases is plain and undeniable. The territories where the crimes were committed, and to which the criminal fled, were parts of the same empire, and under one common sovereign. The King of England could have no privilege against the king of Ireland ; being one and the same person. Calcutta is part of the British empire. The common good of the whole forbids an asylum in one part, for crimes committed in another. So, prior to the American revolution, a criminal who fled from one colony found no protection in another : he was arrested, wherever found, and sent for trial to the place where the offence was committed. On this principle the court of cassation, in Paris, decided O'Donn's case, in the year 1808, (2 Hall's Law Journ. 112.) O'Donn was convicted of robbery, in Genoa, and sentenced to nine years labour in irons, while Genoa was an independent government. He fled to France, enlisted in the army, and then did meritorious service. Afterwards, Genoa became united to the French empire, and it was made a question whether O'Donn was entitled to protection in France. It was held, that he was not : that the right of any law was founded, not on the privilege of the fugitive, but of the sovereign to whom he fled, and therefore ceased, on the union of Genoa with France. But there are two other judicial cases in England, in which it is supposed that the right of demanding a fugitive from a *foreign* country is recognized as the law of nations. The case of the King vs. Hutchinson is very shortly reported in 3 Kel. 785. (29th year of Charles II.) The following is the whole of the report: On a

habeas corpus, it appeared, that the defendant was committed to New-Gate, on suspicion of murder in Portugal, which (by Mr. Attorney) being a fact out of the king's dominions, is not triable by commission upon 35 Hen. 8. c. 3. s. 1. but by a constable and marshal; and the court refused to bail him." Now, there is nothing here like an intent to send the man to Portugal. But Sergeant Corbet, speaking of this case in the King v. Kimberby, (cited before,) said, that Hutchinson was sent to Portugal for trial. What was his authority for this assertion we know not; so that the matter is at least doubtful. But the authority most relied on, is the *dictum* of Justice Heath, in Meer v. Kay, 4 Taunton, 34. 43. on which Chitty forms his opinion in his treatise on criminal law, (1 Chitty, 16.) The court of Common Pleas gave no opinion on the point in question, in Meer v. Kay; but Heath, J. said, " it has generally been understood, that by *the comity of nations*, the country in which a criminal has been found, has aided the police of the country against whom the crime was committed, in bringing the criminal to punishment. In Lord Loughborough's time, the crew of a Dutch ship·mastered the vessel, and brought her into Deal; and it was a question, whether we could seize them, and send them to Holland; and it was held that we might; and the same has been the law of all civilized nations."

Having now gone through all the European opinions and authorities, I will make a few observations on them, before I consider what is far more important—the opinions and authorities of our own country.

That no crime should go unpunished, and that the government which protects a fugitive from justice, becomes the abettor, and in some measure the partner of his

PHILAD'A,
August, 1823.

The Com'th
v.
Deacon.

crime, is a beautiful theory, but attended, in practice, with every difficulty. If all nations had the same idea of crimes and punishments, and if all were equally upright and impartial in the administration of justice, there could be no cause of complaint, if the accused was always sent for trial to the place of his offence; indeed, that would be the most proper place, because, in general, there the evidence is to be sought. But it is not so. What some consider as a slight offence, is by others deemed worthy of death. In some, an impartial trial may be expected; in others, trial is but a cruel mockery. For these and other reasons, the theory of Grotius has not been adhered to in practice. He says himself, that for ages, it has not been the custom to demand the delivery of a fugitive, except in case of crimes against the state, and other heinous offences; and all who have adopted his opinion, mention crimes against the state as peculiarly those in which an offender should find no protection. Now, it must be confessed, that in a mild, paternal government, treason is the greatest of crimes. But when government becomes oppressive, the best citizen, with the best intentions, may be implicated in treason; and therefore it is, that the very crime which Grotius denounces as that which should be cut off from all asylum, is precisely the one to which, at the present day, an asylum is always granted by liberal and enlightened nations. There are at this moment, both in England and America, fugitives from France, Spain, Portugal, Savoy, and Naples, all guilty of treason by the laws of their respective countries; yet all living in undisturbed quiet, all trusting, with undoubting confidence, to the protection of the government to which they have fled. To say nothing of ourselves: would England give one of these

people up? Or, rather, would it not be deemed almost
an insult to demand a delivery? The most heinous crime,
next to treason, is murder. Yet there the degrees of
guilt are so widely different, that the nature of each case
should be well considered, before a fugitive is given up.
Murder in a duel is, undoubtedly, a great crime; but is
it such, in the general estimation of nations, as would
preclude the guilty fugitive from protection? The same
remark is applicable to a murder in a tumult, where po-
litical and party dissensions run high. Such unfortun-
ate cases partake much of the nature of civil wars, and
cannot be compared to murder of an individual, for the
base purpose of robbery. In short, a crime can scarcely
be conceived, in which the degrees of guilt are not so
various, that the sovereign on whom a demand is made,
ought to exercise his own judgment, and determine, ac-
cording to the circumstances of the case, whether or not
the fugitive should be surrendered. He has a right to
consider, also, whether the offence be such as falls within
Grotius' rule of heinous. This is a matter on which
there may be great difference of opinion. Nations not
much engaged in commerce may not think forgery an
offence deserving death. Not so the English. It is what
they never pardon. They pursue it with unrelenting se-
verity. In their treaty with the United States, murder
and forgery were the only crimes in which the delivery
of fugitives was stipulated. In their treaty with France,
(at Amiens) fraudulent baukruptcy was added to murder
and forgery. Now, though England may be excusable
for prescribing an offence which touches her vital inter-
est, can it be said, that another government, differently
circumstanced, and wishing to act fairly and conscien-
tiously towards all mankind, might not refuse to give up

a forger or fraudulent bankrupt to certain death ? The more deeply the subject is considered, the more sensibly shall we feel its difficulties ; so that, upon the whole, the safest principle seems to be, that no state has an absolute and perfect right to demand of another the delivery of a fugitive criminal, though it has what is called an imperfect right ; that is, a right to ask it as a matter of courtesy, good will, and mutual convenience. But a refusal to grant such request, is no just cause of war. No nation has a right to ask the delivery of a fugitive, for the purpose of wreaking its vengeance upon him. All that can be said, is, that unless he be given up, others may be encouraged to transgress, by a hope of escaping punishment, by flight, and then an injury may be sustained. And, indeed, in case of neighboring nations, the argument is so strong as to be almost irresistible, except in cases attended with particular circumstances. It will probably be found, therefore, that between neighbors, this matter has generally been put on some convenient footing, either by convention or long usage. But the more remote two nations are from each other, and the more difficult the passage from one to the other, the less forcible will be the reasons for the demand, and the more doubtful the duty of delivering. It is manifest, that between nations separated by the Atlantic ocean, the inconveniences arising from an asylum to fugitives will be much less than between those who inhabit the same continent.

It will not be matter of wonder, therefore, if between the European and transatlantic nations, a different practice on this delicate subject should prevail from that which may be found necessary among the European na-

tions themselves. Let us see, then, what has been the
practice, so far as concerns the United States of Ameri-
ca. We are now in the 48th year of our independence,
and yet it is not known that, in any one instance, a fugi-
tive from Europe has been surrendered, except Jonathan
Robbins, whose case turned upon our treaty with Great
Britain. And it is worthy of remark, that in the cele-
brated speech of chief justice Marshall, on the floor of
the house of representatives, in defence of the conduct
of president' Adams, at whose request Robbins was de-
livered up by judge Bee to the British government, there
is not a suggestion, or intimation, that the president pos-
sessed any power independently of the treaty. Indeed,
I know of but two instances where a demand, except un-
der the treaty, has been made, and in both the delivery
was refused ; one was the case of the chevalier de Long-
champs, a subject of the king of France, who, in the
year 1784, was demanded of the executive council of the
state of Pennsylvania, by the French minister, to be
sent to France, and there tried, and punished, for an in-
sult offered in the city of Philadelphia, to Mr. De Mar-
bois, secretary of legation to the French embassy, and
consul general of France. The council consulted the
judges of the supreme court, and by their advice refused
to deliver De Longchamps, who was punished, however,
on an indictment in Philadelphia, for breach of the law
of nations. (1 Dall. 3.) This was before the existence
of the present federal constitution. But the other case
which I am about to mention was since the adoption of
this constitution. In the year 1793, Mr. Genet, minister
of the French republic, requested of Mr. Jefferson, sec-
retary of state, a warrant for the arrest of several per-
sons, citizens of France, who had escaped from the

PHILAD'A,
August, 1823.

The Com'th
v.
Deacon.

PHILAD'A,
August, 1823.

The Com'th
v.
Deacon.

French ship of war Jupiter, after committing crimes against the republic. The answer of Mr. Jefferson, in the following words, will be found in the first volume of American state papers, p. 175. "The laws of this country take no notice of crimes committed out of their jurisdiction. The most atrocious offender coming within their pale, is received by them as an innocent man, and they have authorized no one to seize, or deliver him. The evil of protecting malefactors of every dye, is sensibly felt here, as in other countries: but until a reformation of the criminal codes of most nations, to deliver fugitives from them, would be to become their accomplices. The former is viewed, therefore, as the lesser evil. When the consular convention with France was under consideration, this subject was attended to; but we could agree to go no farther than is done in the ninth article of that instrument, where we agree mutually to deliver up captains, officers, mariners, sailors, and all other persons being part of the crews of vessels, &c. Unless, therefore, the persons before named be part of the crew of some vessel of the French nation, no person in this country is authorized to deliver them up; but, on the contrary, they are under the protection of the laws."

In the conclusion of Mr. Jefferson's letter, he says, " I have not yet laid this matter before the president, who is absent from the seat of government; but to save delay, which might be injurious, I have taken the liberty, as the case is plain, to give you this provisionary answer. I shall immediately communicate it to the president, and if he shall direct any thing in addition, or alteration, it shall be the subject of another letter. In the mean time

I may venture to let this be considered as a ground for your proceeding." When this answer was given, General Washington was president of the United States, and General Hamilton, secretary of the treasury. It was at the time of a memorable crisis, when our government took its stand upon neutral ground, and it was necessary to reflect maturely on our duties towards foreign nations. And I believe that no government ever considered that important subject with more candor, or formed its resolutions with more integrity, good faith, and sound judgment, than did ours on that occasion.

It may be presumed, that no change has taken place in the sentiments of the executive, with respect to the delivering up of fugitives from Europe ; because, in the instructions from Mr. Monroe, secretary of state, to our plenipotentiaries charged with negotiating a peace with Great Britain, which terminated in the treaty of Ghent, is the following passage : " Offenders, even conspirators, cannot be pursued by one power, into the territory of another ; nor are they delivered up by the latter, except in compliance with treaties, or by favor." Mr. Madison was president at the date of these instructions ; so that we have the opinion of every president since the formation of the government, except Mr. Adams ; and it is not known, or believed, that he ever dissented. But it is necessary that I should now advert to a decision of the late chancellor of New York, much, and deservedly relied on by the council for the prosecution. It is the case of Daniel Washburn, (4 Johns. Ch. Rep. 106.) who was brought before the chancellor on a habeas corpus, and charged with a larceny of bank notes in Upper Canada. He was discharged for want of sufficient evidence ; but

the chancellor was of opinion, that if the evidence had been sufficient, the prisoner might have been committed, " to the end that a reasonable time might be afforded for the government here to deliver him up, or for the foreign government to make the requisite application to the proper authorities here for his surrender." But who were the proper authorities, whether the executive of the state of New York, or of the United States, the chancellor thought it not necessary to discuss. I am sensible of the weight of an opinion delivered by Chancellor Kent, for whose character, both as a private citizen and an eminent judge, I entertain the very highest respect. No doubt he was strongly impressed with the convenience of that comity between New York and Canada, which is the basis of the practice of the nations of Europe, and the very great inconvenience which would result from the want of it. Whether the state of New York has tacitly consented to a mutual delivering up of criminals by her officers and those of Canada, I know not; nor is it my business to know whether she has a right to enter into such an arrangement. But if the principles laid down in Washburn's case, are to be applied to persons who fly from Europe, and take shelter in the United States, I cannot assent to them. The American government has never recognized the principle of delivering up fugitives, except when bound by treaty. By our consular convention with France, we agreed to give up seamen who deserted from French vessels; and by our treaty with England, (Jay's treaty,) we agreed to give up persons charged with murder and forgery. Both these treaties have expired, and in our subsequent treaties with England the article respecting delivering up has been omitted. I do not consider the treaty with England as merely declara-

tory, and of course, I cannot agree, that on the expiration of that treaty, we were open to a demand of all fugitives from the British dominions, whatever might be their crimes. On the contrary, I suppose that the treaty was intended to give to each nation a right that did not before exist, and that on its expiration, that right ceased, on both sides. That such was the understanding of our government it is impossible to doubt, when it is considered that this treaty was made about a year after Mr. Jefferson's letter to Mr. Genet. The American government has never demanded the delivery of any criminal who has fled from the United States to a foreign country. We all remember the case of Bradford, the leader of the insurrection in this state, in 1793, who fled to the Spanish territory, and remained there in security. It is certain that this matter of delivering up is an affair of state, in which the judges and inferior magistrates cannot act, but as auxiliary to the executive power. The demand of the foreign court is addressed to none but the executive, and no other power than the executive has a right to comply with that demand.

I grant, that when the executive has been in the habit of delivering up fugitives, or is obliged by treaty, the magistrates may issue warrants of arrest, of their own cause, (on proper evidence,) in order the more effectually to accomplish the intent of the government, by preventing the escape of the criminal. On this principle we arrest offenders, who have fled from one of the United States to another, even before demand has been made by the executive of the state from which they fled. But what right is there to arrest, in cases where the government has declared that it will not deliver up? For what

PHILAD'A,
August, 1823.

The Com'th
v.
Deacon.

PHILAD'A,
August, 1823.

The Com'th
v.
Deacon.

purpose is such an arrest? Can any judgment be given by which the executive can be compelled to surrender a fugitive? Most certainly not. If the President of the United States should cause a person to be imprisoned for the purpose of delivering him to a foreign power, the judges might issue a habeas corpus, and inquire into the legality of the proceeding. But they have no authority whatever to make such delivery themselves, or to command the executive to make it. If those principles be just, it follows, that under existing circumstances, no magistrate in Pennsylvania has a right to cause a person to be arrested, in order to afford an opportunity to the President of the United States to deliver him to a foreign government. But what if the executive should hereafter be of opinion, in the case of some enormous offender, that it had a right, and was bound in duty to surrender him; and should make application to a magistrate for a warrant of arrest? That would be a case quite different from the one before me; and I should think it imprudent, at the present moment, to give an opinion on it. Every nation has an undoubted right to surrender fugitives from other states. No man has a right to say, I will force myself into your territory, and you shall protect me. In the case supposed, the question would be, whether, under the existing constitution and laws, the president has a right to act for the nation, or whether he must wait until congress think proper to legislate on the subject. The opinion of the executive hitherto has been, that it has no power to act; and should it ever depart from that opinion, it will be for the judges to decide on the case as it shall then stand. Neither do I give any opinion whether the executive of the state of Pennsylvania has power to cause a fugitive criminal to be arrested for

the purpose of delivering him up.  But confining myself
to the case before me, in which the arrest was made at
the request of a private person, I am of opinion that there
is no law to support it ; and therefore the prisoner is enti-
tled to his discharge.