# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

2015 AUG 26 PM 12: 53
BY______________
DEPUTY

**DIVISION II**

JOYCE M. SMITH, individually and as Personal Representative for the Estate of James W. Smith; IZETTA DILLINGHAM, as Limited Guardian Ad Litem for the minor children, JA'MARI SMITH, JANAJA SMITH, and JAMAE SMITH; and SHAREE DAMMELL, as Limited Guardian Ad Litem for the minor child SHALYSE SMITH,

Appellants,

v.

WASHINGTON STATE DEPARTMENT OF CORRECTIONS; and JOHN AND JANE DOE (1-10)

Respondents.

No. 45479-3-II

PUBLISHED OPINION

MELNICK, J. — Joyce Smith, individually and in her capacity as personal representative of the estate of her husband James Smith,[1] appeals from the trial court's grant of summary judgment in the Department of Corrections' (DOC) favor. The Estate argues that DOC negligently supervised an offender on community custody, causing the offender to murder James Smith. We conclude that because DOC promptly issued an arrest warrant for the offender after he absconded and it had no information about his whereabouts, DOC had no further duty to control the offender. Additionally, the Estate failed to establish a prima facie case of proximate cause for any alleged negligent supervision before the offender absconded. Accordingly, we affirm the trial court's grant of summary judgment to DOC.

---

[1] For the purpose of clarity, we will refer to the appellants collectively as "the Estate" and will refer to James Smith individually by name. We intend no disrespect.

## FACTS

### I. BACKGROUND

Antwane Goolsby pleaded guilty to a charge of conspiracy to commit robbery in the first degree. He received a sentence of 56.25 months in prison and 18 to 36 months of community custody. Goolsby was released from prison on January 21, 2009. Judith Lang, a DOC community corrections officer, supervised Goolsby's community custody.

Lang understood that Goolsby was a "high risk offender" and she was "skeptical about [his] motivation for change." Clerk's Papers (CP) at 62. Goolsby had gang affiliations, mental health issues, and an extensive criminal history.[2] Although Goolsby required mental health medications, he had not been on his medication for a month before his release. Because of his criminal history and his "behaviors while incarcerated," Lang believed that Goolsby was unsuitable to be released in the community. CP at 723.

DOC categorized Goolsby as a "High Violent, untreated, Level II Sex Offender." CP at 300. DOC requires its officers to have three "face to face" contacts and one "collateral" contact per month with offenders at this level. CP at 180. Two of the three "face to face" contacts must be outside the DOC office. CP at 180. At no time during Goolsby's community custody did Lang contact Goolsby in person outside the DOC office. Goolsby received no mental health medications.

---

[2] Goolsby's criminal history included prior convictions for rape in the third degree, violation of the Uniform Controlled Substances Act, failure to register as a sex offender, unlawful possession of a firearm in the second degree, and several misdemeanors.

II.    GOOLSBY'S COMMUNITY CUSTODY

The terms of Goolsby's community custody forbade him from using drugs or associating with drug users. He had to obey all laws and all DOC's instructions. Lang instructed Goolsby to report to DOC daily, to stay in DOC-approved housing, and to stay in King County.

Goolsby had inconsistent compliance. Goolsby reported to DOC on most days when he was not detained.[3] Goolsby also entered a chemical dependency treatment program, but failed to attend most of his sessions. Goolsby lied to DOC about where he resided; he never stayed in a DOC-approved location. Instead, he stayed at a motel where he associated with a fellow offender and drug user. Goolsby may also have been "prostituting girls out and/or dealing from motel room." CP at 54.

DOC arrested and detained Goolsby twice for violating his community custody terms. On his first day of community custody, January 22, 2009, Goolsby walked away from the homeless shelter where Lang had left him. DOC requested a warrant for Goolsby's arrest.[4] Four days later, when Goolsby reported to DOC, he was arrested. On that same day, before his arrest, Goolsby submitted to a drug test that came back positive for marijuana. Goolsby was detained until a DOC hearing on February 18. The hearing officer found Goolsby guilty of violating his community custody conditions, and imposed 21 days confinement as a sanction, with credit for time served.

---

[3] DOC indicated that some of Goolsby's failures to report may have been because he was "legitimately busy handling DOC requirements." CP at 56. Additionally, it is noted in the report that Goolsby's illiteracy was causing him problems accomplishing tasks.

[4] Both of the warrants for Goolsby's arrest were administrative secretary's warrants that may be served either by law enforcement or by a DOC community corrections officer. *See* RCW 9.94A.716(1).

Lang alerted the DOC Community Response Unit (CRU) in Tacoma that Goolsby was out of jail and could not be in Pierce County.[5]

Goolsby's second arrest occurred on March 6, when a DOC agent visited Goolsby at his motel room. There, a man later identified as a fellow gang member of Goolsby's ran to the toilet and attempted to flush a baggie containing cocaine. Goolsby attempted to block the agent from recovering the baggie. The DOC agent immediately detained Goolsby. Pending Goolsby's violation hearing, Lang reported to the hearing officer in a report of "Alleged Violations" that Goolsby's "activities outside the office are indicative of his continued criminal thinking," and that his "behavior and his recent affiliations" are "truly a concern for community safety." CP at 300. Lang recommended that Goolsby be sanctioned to 60 days confinement. Instead, the hearing officer imposed 16 days as a sanction, with credit for time served. Because he had served all of his time for the violation, Goolsby was released on March 23 after the hearing. DOC warned Goolsby not to reside in a motel and Goolsby stated that he intended to "reside homeless in Seattle." CP at 53-54.

Goolsby's last contact with DOC occurred on April 10. On that day, a DOC officer confronted Goolsby because he had been lying about staying in a DOC-approved shelter. The officer warned Goolsby that "failure to reside at [the shelter] would result in violation and possibly arrest." CP at 50. Goolsby agreed to stay at the shelter, but absconded from supervision the following day. On April 16, DOC requested an arrest warrant for Goolsby, which issued the next day. Goolsby was missing until August 5, when he shot and killed James Smith in Tacoma.

---

[5] A CRU is responsible for cooperating with law enforcement to apprehend DOC violators.

III.  PROCEDURAL HISTORY

The Estate sued DOC, claiming that DOC had negligently supervised Goolsby.  The Estate's expert, William Stough, declared that "intensive supervision, combined with treatment" has a statistically significant downward effect on recidivism.  CP at 154.  Stough opined that DOC had failed to enforce Goolsby's community custody conditions and that DOC's omissions "directly led to him absconding supervision," and led to James Smith's death.  CP at 157.  Stough further opined that if DOC had done more to enforce Goolsby's conditions, "Goolsby would have been under control or incarcerated and would not have absconded and 'blown off' supervision completely."  CP at 157.  Finally, Stough opined that strict enforcement of supervision and holding offenders accountable prevents absconding and recidivism and would have done so in this case.

DOC moved for summary judgment dismissal of the Estate's claim for negligent supervision.  After hearing argument and considering the proffered evidence both in support of and in opposition to the motion, the trial court granted DOC's motion for summary judgment.  The Estate appeals.

## ANALYSIS

The Estate argues that DOC negligently supervised Goolsby, causing him to murder James Smith.  "The elements of a negligence cause of action are the existence of a duty to the plaintiff, breach of the duty, and injury to plaintiff proximately caused by the breach."  *Hertog ex rel. S.A.H. v. City of Seattle*, 138 Wn.2d 265, 275, 979 P.2d 400 (1999).  Initially, DOC owed a duty to supervise Goolsby; however that duty ended when Goolsby absconded supervision and DOC issued a warrant for his arrest.  DOC is not liable for its alleged inaction after Goolsby absconded because its duty to supervise him ended.  As for DOC's alleged negligent supervision before Goolsby absconded, we conclude that the Estate failed to establish a prima facie case of proximate

cause. Therefore, the trial court did not err by granting DOC's summary judgment motion to dismiss the Estate's negligent supervision claim.

I.      STANDARD OF REVIEW

We review a trial court's decision to grant summary judgment de novo. *Hertog*, 138 Wn.2d at 275. Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); *Hertog*, 138 Wn.2d at 275. We consider all facts in the light most favorable to the nonmoving party. *Vallandigham v. Clover Park Sch. Dist. No. 400*, 154 Wn.2d 16, 26, 109 P.3d 805 (2005). But we do not weigh evidence or resolve factual disputes. *Babcock v. State*, 116 Wn.2d 596, 598-99, 809 P.2d 143 (1991).

The parties bear different burdens in a summary judgment motion. The moving party bears the burden of showing that there is no genuine issue of material fact. *Atherton Condo. Apartment–Owners Ass'n Bd. of Dirs. v. Blume Dev. Co.*, 115 Wn.2d 506, 516, 799 P.2d 250 (1990). If the moving party is the defendant and meets its burden,[6] then the inquiry shifts to the party with the burden of proof at trial to present admissible evidence to establish a material factual dispute. *Atherton*, 115 Wn.2d at 516; *Young v. Key Pharm., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989). "If, at this point, the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' then the trial court should grant the motion." *Young*, 112 Wn.2d at 225 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). In such a situation, a failure of proof "'concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial'". *Young*, 112 Wn.2d at 225 (quoting *Celotex Corp.*, 477 U.S. at 322-23).

---

[6] The moving defendant may meet this initial showing "'by pointing out'" to the court that there is an absence of evidence to support the nonmoving party's case. *Young*, 112 Wn.2d at 225 n.1 (quoting *Celotex Corp.*, 477 U.S. at 325).

"'Circumstantial evidence is sufficient to establish a *prima facie* case of negligence if it affords room for . . . reasonable minds to conclude that there is a greater probability that the conduct relied upon was the proximate cause of the injury than there is that it was not.'" *Hernandez v. W. Farmers Ass'n*, 76 Wn.2d 422, 426, 456 P.2d 1020 (1969) (quoting *Wise v. Hayes*, 58 Wn.2d 106, 108, 361 P.2d 171 (1961)); *Martini v. Post*, 178 Wn. App. 153, 165, 313 P.3d 473 (2013). But the nonmoving party may not rely on speculation or argumentative assertions that unresolved factual issues remain. *White v. State*, 131 Wn.2d 1, 9, 929 P.2d 396 (1997).

## II. DUTY

The Estate argues that DOC had a duty to exercise reasonable care to supervise Goolsby and protect the public from his harmful propensities. DOC concedes that it initially had a duty to supervise Goolsby, but argues that this duty ended when Goolsby absconded from community custody and a warrant issued for his arrest. We agree with DOC.

The existence of a duty is a question of law. *Hertog*, 138 Wn.2d at 275. Generally, an actor "has no duty to prevent a third person from causing physical injury to another." *Taggart v. State*, 118 Wn.2d 195, 218, 822 P.2d 243 (1992). An important exception to this rule exists when "a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct." *Taggart*, 118 Wn.2d at 218 (quoting RESTATEMENT (SECOND) OF TORTS § 315 (1965)). One example of such a special relation is the relationship between a parole officer and a parolee. *Taggart*, 118 Wn.2d at 219. Because a parole officer takes charge of a parolee, our Supreme Court imposes a special duty on parole officers:

> When a parolee's criminal history and progress during parole show that the parolee is likely to cause bodily harm to others if not controlled, the parole officer is under a duty to exercise reasonable care to control the parolee and to prevent him or her from doing such harm.

*Taggart*, 118 Wn.2d at 220; *see* RESTATEMENT (SECOND) OF TORTS § 319 (1965). Community corrections officers have the same duty with regard to the offenders they supervise. *Joyce v. Dep't of Corr.*, 155 Wn.2d 306, 316-17, 119 P.3d 825 (2005). DOC "assume[s] the duty of supervising an offender's conduct" and "has the ability to take steps to ensure, as a condition of release, that the offender complies with the conditions of release." *Joyce*, 155 Wn.2d at 316.

Recently, Division One of our court considered whether DOC continues to owe a duty to supervise an offender after the offender absconds and DOC issues a warrant for his arrest. *Husted v. State*, 187 Wn. App. 579, 348 P.3d 776, 778 (2015). The *Husted* court recognized that DOC's ability to exercise control over an offender is dependent on the continuing nature of the relationship between an offender and his or her community corrections officer. *Husted*, 348 P.3d at 780. Where an offender absconds and a warrant issues for his arrest, the offender is no longer subject to the community correction officer's control because the offender cannot be monitored, given direction, or sanctioned. *Husted*, 348 P.3d at 780. Division One concluded that "where an offender absconds from supervision and a warrant is issued for his or her arrest, the requisite continuing relationship no longer exists and the duties associated with the take charge relationship are terminated unless and until the person is apprehended." *Husted*, 348 P.3d at 781.

We agree with Division One that DOC's duty to supervise an offender is dependent on the existence of a continuing relationship between the offender and the community corrections

officer.[7] In this case, the special relationship between the offender and DOC terminated once Goolsby absconded and an arrest warrant issued.

Here, Goolsby's last contact with DOC occurred on April 10. DOC issued a warrant for Goolsby's arrest within one week. DOC had no contact with Goolsby and no information about his whereabouts until August 5, when he shot and killed James Smith in Tacoma. Under the facts of this case, DOC's ongoing relationship with Goolsby ended when he absconded community supervision and DOC issued a warrant for his arrest. The take charge relationship ceased to exist and there are no facts to support the reestablishment of the special relationship. Therefore, we conclude that DOC did not have a duty to supervise Goolsby at the time he murdered James Smith.

This conclusion, however, does not end our analysis. It is undisputed that DOC owed a duty to supervise Goolsby for compliance with the court's sentencing order prior to his absconding. Therefore, we must still consider the Estate's argument that DOC's breach of its duty to supervise Goolsby, prior to him absconding and a warrant issuing, was a proximate cause James Smith's murder.

---

[7] We want to make clear that, we are not adopting Division One's holding that the relationship cannot be reestablished "unless and until the person is apprehended." *Husted*, 348 P.3d at 781. A court evaluating whether DOC owes an ongoing duty to supervise an offender must determine whether, under the facts of the particular case, the offender and his or her community corrections officer have a continuing relationship that enables DOC to exercise meaningful control over the offender. We note that there may be circumstances short of apprehending the offender that arguably could reestablish DOC's duty to supervise an offender. For example, DOC cannot ignore information about an absconding offender's whereabouts to avoid reestablishing a continuing relationship with the offender. But, such facts are not present here, and we decline to speculate what facts would constitute that situation.

III.   CAUSATION[8]

We now address whether the Estate's evidence raised an issue of material fact regarding whether DOC's alleged breaches of its duty to supervise, prior to Goolsby absconding and a warrant issuing, caused James Smith's death. The Estate seems to argue that DOC proximately caused James Smith's death based on two theories: if DOC had not breached its duty, Goolsby either would have been in custody at the time of the murder or he would have been rehabilitated. No genuine issue of material fact exists regarding causation under either theory.

Proximate cause is generally a question for the trier of fact, but if reasonable minds cannot differ, then it may be decided as a matter of law. *Hertog*, 138 Wn.2d at 275. Proximate cause consists of two elements: cause in fact and legal causation. *Hartley v. State*, 103 Wn.2d 768, 777, 698 P.2d 77 (1985). Cause in fact concerns the "but for" consequences of an act: those events the act produced in a direct, unbroken sequence, and which would not have resulted had the act not occurred. *Hartley*, 103 Wn.2d at 778. Legal causation rests on considerations of logic, common sense, policy, justice, and precedent as to how far the defendant's responsibility for the consequences of its actions should extend. *Hartley*, 103 Wn.2d at 779.

DOC argued on summary judgment that its actions were not a proximate cause of James Smith's death. Specifically, it argued that the connection between its conduct and James Smith's murder was too speculative and indirect to impose liability because there was no evidence that had DOC acted differently, Goolsby would have been in jail at the time he murdered James Smith. By pointing out that there was no evidence of causation, DOC met its initial burden to show that no material factual dispute existed. Therefore, the critical inquiry is whether the Estate presented

---

[8] For purposes of this appeal, we assume without deciding that material factual issues exist regarding whether DOC breached its duty to supervise Goolsby before he absconded supervision and a warrant issued.

evidence of a sufficient quantity or quality to raise a material issue of fact as to whether Goolsby would not have killed James Smith if DOC had acted differently.

The Estate argues that DOC breached its duty regarding Goolsby in two ways, and that issues of material fact exist regarding whether these breaches caused Smith's murder. First, the Estate argues that DOC failed to properly sanction Goolsby for violations of his community custody conditions. For instance, DOC should have asked the hearing officer to incarcerate Goolsby before April 10 for failing to live in approved housing. The Estate argues that if DOC had sought appropriate sanctions for Goolsby's violations, he would have been in jail at the time of Smith's murder.[9]

However, it is pure speculation that if DOC had reported Goolsby's violations before April 10 that he would have been in jail almost four months later when he murdered James Smith. DOC reported two of Goolsby's violations. At the first violation hearing, the hearing officer imposed 21 days confinement as a sanction; and, at the second violation hearing, the hearing officer imposed 16 days confinement as a sanction, despite Lang's recommendation for a sanction of 60 days confinement. The Estate presented no evidence suggesting that if DOC had reported Goolsby's violations before April 10, he would have been sanctioned with confinement of over

---

[9] The Estate claims Stough testified that Goolsby would have been in jail at the time of Smith's murder if DOC had engaged in proper supervision. However, the Estate provides no record citation for this testimony and Stough's declaration does not contain such testimony. Even if it did, Stough is not qualified to give an opinion on what a hearing's officer might have done at a specific SRA (Sentencing Reform Act of 1981) violation hearing. *See Estate of Bordon ex rel. Anderson v. Dep't of Corr.*, 122 Wn. App. 227, 246-47, 95 P.3d 764 (2004) (affirming determination that Stough is not qualified to testify about what a judge would do in a SRA violation hearing, where he is not a judge, has never supervised an SRA offender, and has never attended an SRA violation hearing). An expert's opinion must be based on facts. *Theonnes v. Hazen*, 37 Wn. App. 644, 648, 681 P.2d 1284 (1984). "An opinion of an expert which is simply a conclusion or is based on an assumption is not evidence which will take a case to the jury." *Theonnes*, 37 Wn. App. at 648. In any event, we will address the Estate's argument.

115 days. Any suggestion that Goolsby would have committed additional violations and received further sanctions is pure speculation which is insufficient to create a genuine issue of material fact. *Hungerford v. Dep't of Corrs.*, 135 Wn. App. 240, 254, 139 P.3d 1131 (2006).

Second, the Estate argues that DOC negligently failed to gain control over Goolsby through its supervision. The Estate relies on Stough's testimony that appropriate supervision reduces recidivism and that if DOC had properly supervised Goolsby, he would not have absconded.

However, we expressly rejected a similar recidivism argument in *Hungerford*, 135 Wn. App. 240. In *Hungerford*, Stough also testified that there was a correlation between recidivism and supervision. 135 Wn. App. at 255. We emphasized that DOC "does not have a duty enforceable in tort" to rehabilitate offenders. *Hungerford*, 135 Wn. App. at 256. As a result, we concluded:

> Even if Hungerford could show that DOC's lack of supervision contributed to Davis's recidivism, as a matter of policy, the connection between the ultimate result and DOC's action is too remote to establish liability. Accordingly, we hold that as a matter of law, DOC's alleged failure to closely supervise Davis and rehabilitate him is not the legal cause of Hungerford-Trap's death.

*Hungerford*, 135 Wn. App. at 256.

Similarly, DOC's supervision duties did not encompass a duty to rehabilitate Goolsby or to somehow change his behavior such that he would not commit murder. As a result, we hold that there is no causal connection between DOC's failure to control Goolsby and the fact that he absconded or the fact that he was willing to engage in criminal activity such as murdering James Smith.

The Estate has failed to meet its prima facie case because it did not identify a theory of causation and provide admissible evidence in support of that theory. The Estate relies on Stough's declaration to show causation. But in reviewing the evidence in the light most favorable to the

Estate, we conclude that because the Estate failed to make a prima facie showing of causation, DOC was entitled to judgment as a matter of law.

We affirm the trial court's grant of summary judgment in DOC's favor.

Melnick, J.

We concur:

Maxa, P.J.

Lee, J.