# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| TIFFANY KELSO, individually, and as guardian for her daughter, G.G., a minor; BRONSON GOUVEIA, individually; TODD ADAMS, individually, and as guardian for his daughter, A.A., a minor; JENNIFER ADAMS, individually; KRISTEN WESTLUND, individually, and as guardian for her daughter, P.W., a minor, | No. 48942-2-II Consolidated with |
| Appellants/Cross Respondents, | |
| v. | |
| OLYMPIA SCHOOL DISTRICT, a public corporation; ROBERT HODGES, individually; WILLIAM V. LAHMANN, individually; JENNIFER PRIDDY, individually; FREDERICK DAVID, STANLEY, individually; BARBARA GREER, individually; GARY D. SHAFER, individually, | |
| Respondents/Cross Appellants. | |
| TIFFANY KELSO, individually, and as guardian for her daughter, G.G., a minor; BRONSON GOUVEIA, individually; TODD ADAMS, individually, and as guardian for his daughter, A.A., a minor; JENNIFER ADAMS, individually; KRISTEN WESTLUND, individually, and as guardian for her daughter, P.W., a minor, | No. 49092-7-II |
| Appellants/Cross Respondents, | |
| v. | |

No. 48942-2-II
Cons. Nos. 49092-7-II; 49272-5-II

| | |
|---|---|
| OLYMPIA SCHOOL DISTRICT, a public corporation; ROBERT HODGES, individually; WILLIAM V. LAHMANN, individually; JENNIFER PRIDDY, individually; FREDERICK DAVID, STANLEY, individually; BARBARA GREER, individually; GARY D. SHAFER, individually,<br><br>      Respondents/Cross Appellants. | |

| | |
|---|---|
| TIFFANY KELSO, individually, and as guardian for her daughter, G.G., a minor; BRONSON GOUVEIA, individually; TODD ADAMS, individually, and as guardian for his daughter, A.A., a minor; JENNIFER ADAMS, individually; KRISTEN WESTLUND, individually, and as guardian for her daughter, P.W., a minor,<br><br>      Appellants,<br><br>    v.<br><br>OLYMPIA SCHOOL DISTRICT, a public corporation; ROBERT HODGES, individually; WILLIAM V. LAHMANN, individually; JENNIFER PRIDDY, individually; FREDERICK DAVID, STANLEY, individually; BARBARA GREER, individually; GARY D. SHAFER, individually,<br><br>      Respondents. | No. 49272-5-II<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>UNPUBLISHED OPINION |

WORSWICK, J. — A.A., G.G., and P.W. (collectively "the children"), were kindergarten students in the Olympia School District. They allege Olympia School District and its employees (collectively "the defendants") were negligent in allowing Gary Shafer, a pedophile, to harm them while riding the school bus.

2

The children appeal the trial court's order striking evidence and granting summary judgment in favor of the defendants. The children argue that the trial court erred when it struck the opinions and testimony of Dr. Robert Wynne under *Frye*,[1] granted summary judgment in favor of the defendants, and failed to apply a spoliation inference against the defendants.

The defendants cross appeal. They argue that the trial court abused its discretion when it denied their motion to bifurcate the proceedings of the three children.

We hold that the trial court did not err when it struck Dr. Wynne's opinions and testimony under *Frye*. Further, we hold that the trial court properly granted summary judgment in favor of the defendants for claims relating to G.G. and P.W. However, we hold that summary judgment was not proper for A.A.'s claims. We also hold that the children are not entitled to a spoliation inference, and the trial court did not abuse its discretion when denying the defendants' motion to bifurcate. Accordingly, we affirm in part, reverse in part, and remand for further proceedings.

FACTS

Gary Shafer was employed as a bus driver for the Olympia School District from 2005 to 2011. Shafer would drive or "ride along" midday routes for kindergarten, pre-kindergarten, and special needs students. Clerk's Papers (CP) at 1268. In 2011, Shafer admitted to molesting

---

[1] *Frye v. United States*, 54 App. D.C. 46, 293 F. 1013 (1923).

multiple students.[2]  Dr. Matthew Logan, a licensed psychologist retained by plaintiffs, diagnosed

Shafer with pedophilia and frotteurism, among other things.[3]  Dr. Logan opined that Shafer

received sexual gratification by having children on his lap, scratching their backs, or engaging in

other nonsexual, nonconsensual touching.

## I.  G.G.

G.G. was a student in the Olympia School District during the 2010-11 school year.  She

rode the school bus from her daycare to her kindergarten class.  Shafer drove G.G.'s bus as a

substitute driver or rode on it at least six times, from the beginning of the school year to early

December 2010.  T.M.C., G.G.'s friend who rode the bus with G.G., was molested by Shafer.

Shortly after T.M.C. disclosed the abuse, T.M.C.'s mother e-mailed the school stating that

T.M.C. had told her parents that Shafer also touched G.G.  The school sent a letter to parents,

including G.G.'s mother, Tiffany Kelso, notifying them that Shafer had been arrested for

inappropriately touching children, but the school did not notify Kelso about T.M.C.'s mother's e-

mail.

---

[2] In the years following Shafer's admissions, multiple children have brought civil actions against
the defendants for damages resulting from harm caused by Shafer.  Two cases have come before
this court.  *K.H. for D.H. v. Olympia Sch. Dist.*, No. 48483-4-II (Wash. Ct. App. Aug. 22, 2017),
http://www.courts.wa.gov/opinions/pdf/D2%2048583-4-II%20Unpublished%20Opinion.pdf,
*rev.denied* 190 Wn.2d 1009, 414 P.3d 583 (2018); *Gutierrez v. Olympia Sch. Dist.*, No. 44324-4-
II, (Wash. App. Ct. Dec. 10, 2014), http://www.courts.wa.gov/opinions/pdf/D2%2044324-4-
II%20Unpublished%20Opinion.pdf, *rev. denied*, 183 Wn.2d 1004, 349 P.3d 857 (2015).

[3] According to Dr. Logan's report, "frotteurism is characterized by a period of at least 6 months,
recurrent intense, sexually arousing fantasies sexual urges, or behaviors involving touching and
rubbing against a non-consenting person."  CP at 527.

G.G.'s personality changed when she began kindergarten. She started throwing tantrums, acting withdrawn, and isolating herself from activities. G.G. regressed in toilet training and refused to wear any type of dress without leggings or tight fitting pants.

In 2013, Kelso learned that G.G. may have had contact with Shafer. When Kelso questioned G.G., G.G. did not state that she had been inappropriately touched. G.G. was subsequently interviewed by a counselor and did not state anything that led Kelso to believe G.G. had been inappropriately touched on the bus. Shafer denied molesting G.G.

## II. A.A.

A.A. was a student in the Olympia School District during the 2010-11 school year. On the bus, A.A. normally sat in the same seat with N.L. and V.M.V. Shafer often rode A.A.'s bus and would sit with her, N.L., and V.M.V. Shafer admitted to molesting N.L. and V.M.V. V.M.V.'s mother alerted A.A.'s parents, Todd and Jennifer Adams, about Shafer's molestation and said that Shafer would put A.A. on his lap or move her to a different seat. A detective working on the Shafer criminal case told the Adamses that Shafer would put an unnamed girl who wore dresses on his lap and take pictures up her skirt. Within a week or two of Shafer's arrest, the Adamses discussed bus rides with A.A. A.A. said that Shafer was funny, nice, and would show her pictures on his phone. She said that she liked Shafer and that he would put her on his lap.

Around first grade, the Adamses noticed behavior regressions with A.A. A.A. began withdrawing and would have time periods where she would shut down. A.A. also transitioned from drawing pictures of smiles and flowers to dark pictures of tears and anger.

5

A.A. did not report that Shafer inappropriately touched her. Shafer denied molesting A.A.

### III. P.W.

P.W. was a kindergarten student in the Olympia School District during the 2008-09 school year. Stephen Kern was one of her bus drivers. On the bus route, P.W. was typically loud and rambunctious. Kern recalled Shafer rode along two to four times. When Shafer rode along, he always sat next to P.W. P.W. would be much calmer when sitting with Shafer.

P.W. did not recall being inappropriately touched or sitting next to a man on the bus. Shafer denies molesting P.W.

### IV. DR. WYNNE'S EVALUATIONS, OPINIONS, AND TESTIMONY

Dr. Robert Wynne conducted separate forensic evaluations of all three children. Dr. Wynne prepared reports based on these evaluations. He concluded, after using DSM-5,[4] that all three children suffered from PTSD (post traumatic stress disorder) resulting from some type of traumatic stressor. Dr. Wynne submitted a declaration that included some findings and opinions from his evaluations of the children. This declaration states, "I have the opinion that on a more probable than not basis to a reasonable degree of medical and scientific certainty . . . there is a causal relationship between the content and timing of the [children's] emotional, physical and behavioral concerns, with their exposure to Mr. Shafer's predations." CP at 1215. At a deposition, Dr. Wynne testified, "I think overall, in a general sense, my opinions were fortified

---

[4] AMER. PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (5th ed. 2013).

6

by the review of recent documents in terms of high probability that these girls were sexually

molested by Gary Shafer." CP at 706.

A.    *G.G.*

In 2014, Dr. Wynne conducted a psychological evaluation of G.G., interviewed Kelso,

and reviewed a variety of reports and evidence in this case. During the evaluation, [G.G.]

recounted Shafer's interactions with T.M.C. Dr. Wynne produced a report of his opinions. He

opined:

> [G.G.] presents as a bright, sensitive, earnest nine-year-old who harbors substantial situational anxiety. The Plaintiff retains vivid, though circumscribed memories of a bus driver, presumably Gary Shafer who molested children on school buses. While on the bus, [G.G.] was percipient witness to the disturbing and confusing acts perpetrated by Shafer who sexually assaulted her friend. Speaking to the practiced pedophile's thinly veiled grooming tactics, coupled with trauma-based avoidant defenses, [G.G.] remains unsure whether Shafer was abusing and/or playfully tickling her friend. In either case, as a five year old [sic], she recognized that the driver had violated a professional boundary. The disquieting incident left lasting impressions upon [G.G.] who remains troubled by the memory.

> Although [G.G.] denies recall of suffering direct contact from the bus driver and while seemingly not cognizant of Shafer's perverse motives, it is evident that she was psychologically harmed by the incident. [G.G.] clearly meets Criterion A for a stressor in the DSM-V diagnosis of posttraumatic stress disorder. [G.G.] witnessed the traumatic event in person; she learned that the traumatic event occurred to a close family member or close friend (with the actual or threatened death being either violent or accidental); in addition, there are a number [of] indicators pointing, [sic] to a likelihood that the child was directly victimized by Shafer.

> In any event, it is more probable than not that [G.G.] suffered greater exposure to Shafer's predations than she remembers. She rode the bus to school every day during the fall of kindergarten. She usually sat with [T.M.C.], who Shafer sexually assaulted. Shafer admitted to using force when sexually assaulting [T.M.C.], which included hand on vagina over clothing two times, hand on vagina under clothing two times, hand on rear-end over clothing 2-3 times. [T.M.C.] told her mother that Shafer "did it to [G.G.] as well."

> . . . .

7

The child's mother reports substantial behavioral changes that erupted during [G.G.'s] first months of kindergarten, which coincided with exposure to Shafer. [G.G.] exhibited regressive behaviors. She began wetting herself at night. Her temperament shifted from emotionally stable, to frequent outbursts and tantrums. While previously independent and a leader among peers, she seemed shame ridden, turned painfully shy, self-conscious and prone to embarrassment. [G.G.] developed difficulties verbalizing and expressing emotions. Tendencies pertaining to altered superego development and an over-active, judgmental conscience surfaced. The mother described her child's rigid, rule-bound, black and white thinking, tendencies to hold a grudge and obsessional trends. [G.G.] also became more guarded and felt the need to wear undergarments. She would "freak out" if not able to wear leggings under her skirts and shorts.

During this evaluation, for the most part, [G.G.] exhibited a proclivity to internalize, minimize and deny upset. Nonetheless, consistent with having suffered a trauma, it is evident that she is burdened by chronic and severe situational stress. Overt symptom constellations are associated with separation anxiety, social anxiety, and obsessive-compulsive trends. She is acutely self-conscious and fears being viewed by others as afflicted or damaged in some way. She is highly vigilant, and "freaked out" in various social situations.

As is common among traumatized children, [G.G.] endorses frequent somatic symptoms, such as headaches and stomachaches. She voices concern about compulsive eating habits. "It feels like I can't stop." She describes herself as forgetful and prone to daydreaming. Four years after the assault, [G.G.] remains triggered by ubiquitous reminders of the bus incident. When she sees a school bus, she is reminded of what happened. Every time she sees [T.M.C.] at school, she is reminded of the incident. The observed sexualized behavior of [G.G.'s] sister also raises concerns regarding transmission of sexual trauma in the home.

CP at 100-02.

B.    *A.A.*

In 2013, Dr. Wynne conducted a psychological evaluation, noting:

[A.A.] was functioning well emotionally, physically and socially prior to entering kindergarten in the fall of 2010. Developmental milestones were on target. However, several factors amplified the child's vulnerability to the grooming tactics of a sexual predator. [A.A.'s] mother reports a psychiatric history that includes post-partum depression and a diagnosis of bipolar disorder. She also suffered childhood sexual trauma. It is noteworthy a child whose mother was sexually abused in her childhood is at greater risk for childhood sexual abuse. Parental

discord led to separation in early 2010 and was an additional stressor that amplified the Plaintiff's vulnerability to a sexual predator. Moreover, she was a quiet child, who was perhaps disinclined to tell her parents if something happened.

. . . .

Now four years post-molestation [A.A.] does not recall events involving Mr. Shafer. However, it is evident that she suffered direct, proximate, and ongoing physical exposure to Shafer's perverse grooming tactics. It is more probable than not that he sexually assaulted the child. [A.A.] was also in immediate proximity and percipient witness to multiple incidents of Shafer assaulting her friends on the bus.

. . . .

This anxious, emotionally fragile nine-year old [sic] presents a symptom complex consistent with having suffered sexual trauma. Symptoms in young children, as is the case for [A.A.], often manifest in non-verbal, behavioral and somatic forms. During the months following exposure to Shafer, [A.A.] exhibited "dramatic" emotional and behavioral changes. Concerns included loss of acquired developmental skills (e.g., toilet training, baby talk, social skills, not wanting to grow up), emotional dysregulation (volatile mood), increased generalized fears (e.g., separation anxiety), avoidance (withdrawal) and recurring nightmares (e.g., out-of-control vehicles and predatory themes) ("I tried to get out but I am too afraid. I always other have [sic] dreams like that. It scares me so bad"). She produced drawings suggesting emotional disturbance and surreptitiously communicated for a week on a website chat room associated with sex hookups, boys and flirting.

CP at 155-56 (citation omitted).

C.      *P.W.*

In 2014, Dr. Wynne conducted a psychological evaluation of P.W. He opined:

[P.W.] was functioning well emotionally, physically and socially prior to entering kindergarten in the fall of 2010. She showed no antecedent symptoms of the ADHD (Attention Deficit Hyperactivity Disorder) disorder prior to meeting Shafer. Developmental milestones were on target, if not advanced. Areas of adversity that potentially amplified [P.W.'s] vulnerability to Shafer's predation included parental discord, parental separation, and the father's drinking problem. In addition, around the time that [P.W.] entered kindergarten, her brother was born. There is possible family history of [ADHD] on the mother's side. Following the exposure to Shafer, [P.W.] began and continued a pattern of distracted and disruptive behavior at school. She began to dislike school. She had some trouble fitting in with peers.

As Putnam found among molested girls, at age eight, she experienced the onset of puberty. The family environment includes that since August 2013 the father has had marginal involvement with [P.W.].

. . . .

There are indications that [P.W.] was psychologically harmed by the contact with Shafer, though she does not remember the assault. It is also probable that at the time, she was incapable of perceiving the bus driver's perverse motives and comprehending his actions. During the fall of 2010, [P.W.] exhibited an array of sudden symptoms that family members had not witnessed beforehand. The presumption at the time was that the child evidenced behaviors associated with an ADHD diagnosis. [P.W.] was distracted, active and disruptive. Certainly, ADHD cannot be entirely ruled out as a pre-existing condition that pre-dated contact with Shafer. However, it is also important to consider that ADHD symptoms are easily confused with traumatic sequelae. Dissociative concerns can be mistaken for distractibility. Hyperactivity and impulsivity can be secondary to posttraumatic hyper-physiologic arousal. What is more, there can be comorbidity of the two psychiatric conditions. If in fact [P.W.] had ADHD when entering kindergarten, impulsive and hyperactive behaviors associated with the disorder could have increased her vulnerability to a sexual predator. In effect, the symptoms could have functioned to increase likelihood that Shafer would target the child—as he did. In turn, it is probable that [P.W.] was exhibiting trauma-based symptoms as a direct result of sexualized contact by Shafer. Posttraumatic sequelae such as hyperarousal and hypervigilance would serve to aggravate attentional and hyperactive difficulties resulting from ADHD. Speaking to evidence against an ADHD diagnosis, in recent time, more acute signs of the disorder have abated.

Nonetheless, [P.W.] remains an anxious child with substantial fears associated with abandonment and relatively frequent nightmares. Another sign of stress, [P.W.] compulsively picks at the cuticles of her skin and engages in regular fingernail (and toenail) biting. Somatic symptoms include chronic digestive concerns, body pains, and diarrhea. She is easily fatigued, prone to injury and daydreams. Perfectionism and self-esteem issues are evident.

CP at 196-97.

## V. PROCEDURAL HISTORY

The children and their parents, Kelso, Bronson Gouveia, Kristin Westlund, and the

Adamses, filed a complaint against the defendants, alleging gross negligence, negligence, and

negligent infliction of emotional distress. Kelso, G.G., Gouveia, Westlund, and P.W. also

alleged mandatory reporting failures under former RCW 26.44.030 (2015).

The defendants moved to bifurcate the three families' claims. The trial court denied this

motion without prejudice. After conducting discovery, the defendants again moved for

bifurcation. The trial court denied the renewed motion to bifurcate with prejudice, citing judicial

economy and convenience of the parties. Subsequently, the trial court denied the defendants'

(except Shafer) motion for relief from the denial of the renewed motion to bifurcate.

The defendants subsequently moved for summary judgment dismissal of all plaintiffs'

claims. The defendants submitted a declaration in support of the motion for summary judgment

which included Dr. Wynne's full reports. The children, in response to the motion, submitted Dr.

Wynne's declaration. The full reports explicitly conclude that all three children were likely

sexually molested by Shafer and their PTSD was caused by such molestation. Dr. Wynne's

declaration submitted by the children, however, concluded that it was more likely than not that

Shafer caused the three children PTSD harm generally by being in a "toxic, sexually charged,

psychologically harmful environment" Shafer created. CP at 1215. The defendants then moved

to strike inadmissible evidence, arguing that a variety of hearsay and other evidence submitted

by the children was inadmissible. Relevant here, the defendants argued that Dr. Wynne's

opinions and testimony were inadmissible under *Frye*. The defendants then argued that absent

the inadmissible evidence, the plaintiffs cannot show Shafer caused them harm.

The trial court granted the defendants' motion to strike Dr. Wynne's opinions and

testimony and granted the defendants' motion for summary judgment only on the children's

claims. Thus, the trial court dismissed the children's claims, but not the case in its entirety.[5] The

defendants sought discretionary review of the orders denying their renewed motion to bifurcate

and the associated motion for reconsideration. The children sought discretionary review of the

order striking Dr. Wynne's opinions and granting the defendants' motion for summary judgment

dismissal. We accepted discretionary review of and consolidated all three appeals.

ANALYSIS

I. ADMISSIBILITY OF DR. WYNNE'S DECLARATION

The children argue that the trial court improperly struck Dr. Wynne's declaration based

on *Frye*.[6] Specifically, the children argue that *Frye* does not apply because Dr. Wynne's

scientific methodology was not novel. The defendants argue that Dr. Wynne's methodology was

impermissible "reverse engineering" of symptoms to find a conclusion of abuse and that Dr.

Wynne was merely profiling sexual abuse victims. Br. of Resp't at 24. We hold that the *Frye*

---

[5] The trial court dismissed all the children's claims, including, without specifically naming, G.G.'s and P.W.'s claims for mandatory reporting failures. Because the children do not argue the dismissal of the reporting failure claims in this discretionary review, we do not address the issue.

Moreover, although plaintiffs raised negligent infliction of emotional distress claims in their amended complaint, those claims are based solely on mandatory reporting failures. For the first time at oral argument, the children allege negligent infliction of emotional distress for other acts. To the extent the children claim negligent infliction of emotional distress for acts separate from mandatory reporting violations, such claims were not briefed and are not within the scope of the order granting discretionary review. Thus, we do not address them.

[6] The parties' briefs claim that Dr. Wynne's "declaration" was stricken. However, the order granting the motion strikes "the opinions and testimony of Dr. Robert Wynne provided in the record before the Court." CP at 1851. Dr. Wynne's declaration, full reports, and deposition were before the trial court.

test applies to Dr. Wynne's opinions and that the trial court properly struck Dr. Wynne's opinions and testimony.

A.      *Legal Principles*

We review de novo a trial court's admissibility ruling under *Frye*. *Anderson v. Akzo Nobel Coatings, Inc.*, 172 Wn.2d 593, 600, 260 P.3d 857 (2011). "The *Frye* test is implicated only where the opinion offered is based upon novel science." *Anderson*, 172 Wn.2d at 611. Although *Frye* governs the admissibility of novel scientific testimony, accepted techniques used to reach novel conclusions do not raise *Frye* concerns. *Lakey v. Puget Sound Energy, Inc*., 176 Wn.2d 909, 919, 296 P.3d 860 (2013).

If an expert's scientific methods "are widely accepted in the relevant scientific community, the evidence is admissible under *Frye*, without separately requiring widespread acceptance of the plaintiff's theory of causation." *Anderson*, 172 Wn.2d at 609. *Frye* does not require that an expert's specific conclusions be generally accepted in the scientific community, nor does *Frye* "require every deduction drawn from generally accepted theories to be generally accepted." *Anderson*, 172 Wn.2d at 611.

*State v. Jones* specifically addresses expert opinions identifying child abusers through the child's symptoms under *Frye*. 71 Wn. App. 798, 863 P.2d 85 (1993). Jones was convicted of first degree child molestation and first degree child rape. *Jones*, 71 Wn. App. at 802. During the criminal trial, a social worker testified to common traits of sexually abused children. *Jones*, 71 Wn. App. at 804. The social worker based her opinions on the 300 to 400 children she had worked with in that role. *Jones*, 71 Wn. App. at 803. She stated that behaviors of sexually acting out, victimization by others, and night terrors were common with sexually abused

children. *Jones*, 71 Wn. App. at 804. The social worker testified further that she believed that

Jones abused the child and the child's sexualized behaviors, victimization, and night terrors were

consistent with other children who had been sexually abused. *Jones*, 71 Wn. App. at 804.

Division One of this court determined that the social worker's statements were closely

related to generalized profile or syndrome testimony. *Jones*, 71 Wn. App. at 817, 820. Thus, the

court analyzed the testimony that the child's behaviors were consistent with sexually abused

children as expert opinion under ER 702. *Jones*, 71 Wn. App. at 817-21. As a result, the court

analyzed "the admissibility of generalized sexual abuse 'syndrome' testimony [based on a

caseworker's clinical observations] under *Frye*." *Jones*, 71 Wn. App. at 817. It determined that

> when personal experience is used as a basis for generalized statements regarding the behavior of sexually abused children as a class, the testimony crosses over to scientific testimony regarding a profile or syndrome, whether or not the term is used, and therefore should be subject to the standard set forth in *Frye*. When the testimony is limited to the witness's observations of a specific group, the *Frye* standard is not applicable.
>
> . . . .
>
> The prevalent objection to such testimony is that a general profile of typical behaviors is not specific to sexual abuse, but may be produced by other traumatic events in the life of the child. . . .
>
> Accordingly, a substantial number of courts have noted that expert testimony regarding a profile or syndrome of child sexual abuse victims is not admissible to prove the existence of abuse or that the defendant is guilty.

*Jones*, 71 Wn. App. at 818-19 (internal citations omitted). As a result, the *Jones* court held that

"the use of generalized profile testimony, whether from clinical experience or reliance on studies

in the field, to prove the existence of abuse is insufficient under *Frye*," unless that testimony is

used to rebut an inference that specific victim behaviors are not consistent with abuse. *Jones*, 71

Wn. App. at 820.

14

B.      *Dr. Wynne's Opinions Are Inadmissible under* Frye

Here, the defendants do not challenge forensic evaluations or the use of DSM-5 as novel

science. Rather, the defendants argue *Frye* applies to Dr. Wynne's "reverse engineering" of

symptoms. Br. of Resp't at 24. We hold that Dr. Wynne's opinions are impermissible under

*Frye*.

Dr. Wynne conducted forensic evaluations of each child. In his declaration, Dr. Wynne

explained DSM-5's PTSD symptomology. He stated that he used DSM-5 to analyze the

children's symptoms and found them to be consistent with "exposure to a traumatic stressor."

CP at 1218. Dr. Wynne also cited psychiatric literature to explain specific trauma symptoms that

he opined as potentially present with the children. Dr. Wynne's opinion was that the children's

PTSD symptoms were caused by their exposure to Shafer. Specifically, his expert opinion was

"that on a more probable than not basis to a reasonable degree of medical and scientific certainty

. . . there is a causal relationship between the content and timing of the [children's] emotional,

physical and behavioral concerns, with their exposure to Mr. Shafer's predations." CP at 1215.

Dr. Wynne used forensic evaluations and symptoms consistent with DSM-5 and

psychiatric literature to determine that the children suffered harm from trauma. This alone does

not implicate *Frye*. However, Dr. Wynne went further than merely conducting evaluations and

finding symptoms of trauma. Dr. Wynne considered this scientific conclusion along with other

evidence, documents, and materials in the case to form his opinion that, more probably than not

to a reasonable degree of medical and scientific certainty, the children's harm was caused by

their exposure to Shafer, a serial pedophile. Dr. Wynne's intermingling of the forensic

15

evaluation results with the evidence in the case to identify Shafer as the probable cause of the

children's harm implicates *Frye*, and fails to meet the *Frye* standard.

The children do not cite, nor after a diligent search can we find, cases that support Dr.

Wynne's method of using symptoms of trauma to identify a sexual abuser. In fact, *Jones* and

other cases analyzing this issue come to the opposite conclusion. *Jones*, 71 Wn. App. at 818-20;

*see also State v. Saldana*, 324 N.W.2d 227, 229-30 (Minn. 1982) (holding that symptoms of rape

trauma syndrome are not scientifically reliable to determine whether a rape occurred); *Ward v.*

*Commonwealth*, 570 S.E.2d 827, 830 (Va. 2002) (holding that expert testimony on PTSD

regarding rape was admissible when expert did not testify to the cause of the PTSD); *State v.*

*Lark*, 678 S.E.2d 693, 702 (N.C. Ct. App. 2009) (holding that evidence of PTSD cannot be

admitted for the purpose of proving a rape); *State v. Ashburn*, 914 S.W.2d 108, 111-13 (Tenn.

Crim. App. 1995) (holding that PTSD or rape trauma syndrome evidence cannot be admitted to

prove a rape); *People v. Singh*, 186 A.D.2d 285, 285, (N.Y. App. Div. 1992) (holding that expert

testimony on PTSD or rape trauma syndrome is inadmissible to prove that a rape occurred).

Because an expert cannot use trauma symptoms to prove abuse, let alone determine the identity

of an abuser, we hold that Dr. Wynne's opinions are inadmissible under *Frye*.[7]

---

[7] A separate psychologist, Dr. Mark Whitehill who is a certified sex offender treatment provider, conducted an evaluation of A.A. and rendered an opinion that, based on A.A.'s symptoms, there was a significant risk that Shafer molested A.A. This evaluation was submitted by the defendants in support of their motion for summary judgment. Although the defendants moved to exclude Dr. Whitehill's opinions along with Dr. Wynne's opinions, the order striking the evidence refers only to Dr. Wynne's opinions, and not to Dr. Whitehill's. On summary judgment, we do not consider evidence that is inadmissible at trial. *Larson Motors, Inc. v. Snypp*, 3 Wn. App. 2d 127, 136, 413 P.3d 632 (2018). Dr. Whitehill's evaluation suffers the same deficiencies as Dr. Wynne's. Accordingly, we do not consider Dr. Whitehill's evaluation.

II. SUMMARY JUDGMENT

The children argue alternatively that, even without Dr. Wynne's opinions, the trial court improperly granted the defendants' motion for summary judgment regarding the children's negligence claims. Specifically, the children argue that Shafer harmed them by creating a toxic, sexualized environment on the buses, and Shafer's sexual motivations made otherwise nonsexual touches harmful. We hold that P.W.'s and G.G.'s claims do not survive summary judgment, but A.A.'s claims do.

A. *Summary Judgment Legal Principles*

We review summary judgment decisions de novo and perform the same inquiry as the trial court. *Lakey*, 176 Wn.2d at 922. We view the evidence, and all reasonable inferences therefrom, in the light most favorable to the nonmoving party. *Keck v. Collins*, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. CR 56(c). A material fact is one on which the outcome of the litigation depends. *In re Estate of Black*, 153 Wn.2d 152, 160, 102 P.3d 796 (2004).

A defendant is entitled to summary judgment if (1) the defendant shows the absence of evidence to support the plaintiff's case, and (2) the plaintiff fails to come forward with evidence creating a genuine issue of material fact on an element essential to the plaintiff's case. *Clark County Fire Dist. No. 5 v. Bullivant Houser Bailey P.C.*, 180 Wn. App. 689, 699, 324 P.3d 743 (2014). If a defendant satisfies the initial burden of establishing the absence of a material fact, the inquiry then shifts to the plaintiff. *Burton v. Twin Commander Aircraft LLC*, 171 Wn.2d 204, 222-23, 254 P.3d 778 (2011). If the plaintiff fails to make a showing sufficient to establish

the existence of an element essential to that party's case, then summary judgment is proper. *Burton*, 171 Wn.2d at 223.

Mere allegations, argumentative assertions, conclusive statements, or speculation do not raise issues of material fact sufficient to preclude a grant of summary judgment. *Spradlin Rock Prods., Inc. v. Pub. Util. Dist. No. 1 of Grays Harbor County*, 164 Wn. App. 641, 654, 266 P.3d 229 (2011). Where reasonable minds could reach but one conclusion from the admissible facts, summary judgment should be granted. *Elliott Bay Seafoods, Inc. v. Port of Seattle*, 124 Wn. App. 5, 12 n.2, 98 P.3d 491 (2004). We may affirm summary judgment on any ground supported by the record. *Riley v. Iron Gate Self Storage*, 198 Wn. App. 692, 700, 395 P.3d 1059 (2017).

B.    *G.G. and P.W. Do Not Present Genuine Issues of Material Fact To Overcome Summary Judgment, but A.A. Does*

To prevail in a negligence action, a plaintiff must show that (1) a defendant had a duty to the plaintiff, (2) the defendant breached that duty, (3) a harm resulted, and (4) the harm was proximately caused by the defendant's breach. *N.L. v. Bethel Sch. Dist.*, 186 Wn.2d 422, 429, 378 P.3d 162 (2016). Circumstantial evidence is sufficient to establish a prima facie case of negligence if a reasonable person could conclude that there is a greater probability than not that the conduct relied upon was the proximate cause of the injury. *Smith v. Wash. State Dep't of Corr.*, 189 Wn. App. 839, 847, 359 P.3d 867 (2015).

Proximate cause has two components: cause in fact and legal cause. *N.L.*, 186 Wn.2d at 436-37. Cause in fact denotes that "but for" an act, the consequences would not have occurred. *N.L.*, 186 Wn.2d at 437. Legal cause contemplates how far legal consequences should extend for a defendant's breach. *N.L.*, 186 Wn.2d at 437. There may be more than one proximate cause of

18

a harm. *Mehlert v. Baseball of Seattle, Inc.*, 1 Wn. App. 2d 115, 118, 404 P.3d 97 (2017). Usually, causation is a question for the jury, but causation becomes a question of law "only when the causal connection is so speculative and indirect that reasonable minds could not differ." *Mehlert*, 1 Wn. App.2d at 119.

Here, the defendants do not contest the duty of a school district to its students. Rather, the defendants argue that the children failed to provide evidence of a breach by the defendants that caused the alleged PTSD harms. The defendants argue that the children must prove that the harm suffered was sexual abuse. The children argue on appeal that they were generally harmed being exposed to a toxic, sexualized environment created by Shafer. We hold that G.G.'s and P.W.'s claims do not overcome summary judgment dismissal, but A.A.'s claims do.

Here, the children contend that Shafer created a toxic, sexualized environment that caused harm to them. They argue that their direct contact with or proximity near Shafer and other children he molested caused them harm. Specifically, the children contend that their repeated interactions with Shafer, combined with his frotteurism toward children, results in a cognizable and actionable harm. However, there is no evidence of this toxic, sexualized environment. None of the children spoke about or described a toxic, sexualized environment. The concept of a toxic sexualized environment is one of Dr. Wynne's inadmissible opinions.

Further, Shafer's personal thoughts are not at issue. His perverse sexual gratification through nonsexual touching does not raise a material fact that the children were harmed by being touched in these ways. The children appear to have viewed all contact with Shafer as innocuous, or not recalled contact at all.

However, G.G.'s and P.W.'s physical contacts with Shafer were markedly different from A.A.'s. There is no evidence that Shafer molested or touched G.G.'s or P.W.'s intimate areas. Absent Dr. Wynne's inadmissible opinions, there is no evidence that G.G. or P.W. was exposed to a "toxic, sexualized environment" that caused them harm. Because the only potential, admissible proof of this toxic environment is their symptomatology, G.G.'s and P.W.'s claims are insufficient to raise a material fact regarding causation. Accordingly, we hold that G.G.'s and P.W.'s claims do not overcome summary judgment dismissal.

However, A.A.'s claims are distinguishable from G.G.'s or P.W's because of the extent of the contact between A.A. and Shafer. Shafer placed A.A. on his lap to show her pictures on his phone. This resulted in her buttocks being on his upper leg or crotch area. This contact between Shafer and A.A. involves his touching of an intimate part of her body. Unlike G.G. and P.W., A.A. has presented facts that show Shafer's contacts could have been molestations which must be decided by a trier of fact. A.A. often wore dresses, and the evidence established that Shafer took pictures up an unnamed little girl's dress while she was on his lap. Further, A.A. has shown potential harm resulting in behavior regressions, social withdrawals or shutting down for a period of time.

Taking the facts and reasonable inferences in favor of A.A., there is a question of material fact regarding whether Shafer's contacts caused harm to A.A. This causation question is for the jury to answer. Accordingly, the trial court erred when dismissing A.A.'s claims on summary judgment.

20

III.  SPOLIATION

The children argue that they are entitled to a spoliation inference because the defendants destroyed evidence by failing to disclose Shafer's behavior.  We disagree.

Spoliation is the "intentional destruction of evidence."  *Tavai v. Walmart Stores, Inc.*, 176 Wn. App. 122, 134, 308 P.3d 811 (2013).  In determining whether to apply a spoliation inference against a party who destroyed evidence, we consider "the potential importance or relevance of the missing evidence" and "the culpability or fault of the adverse party."  *Tavai*, 176 Wn. App. at 135.  The importance of the missing evidence depends on the facts of each case.  *Tavai*, 176 Wn. App. at 135.

Regarding culpability, we consider whether the party has an innocent explanation for the destroyed evidence or whether the party's bad faith or conscious disregard led to the loss of the evidence.  *Tavai*, 176 Wn. App. at 135.  Further, we consider if the party violated some duty to preserve the evidence.  *Tavai*, 176 Wn. App. at 135.  However, there is no general duty to preserve evidence and "a party's negligent failure to preserve evidence relevant to foreseeable litigation is not sanctionable spoliation."  *Cook v. Tarbert Logging, Inc.*, 190 Wn. App. 448, 464, 470, 360 P.3d 855 (2015).  Ordinarily, we review a trial court's refusal to apply a spoliation inference for an abuse of discretion.  *Henderson v. Tyrrell*, 80 Wn. App. 592, 604, 910 P.2d 522 (1996).  However, when the trial court's decision on spoliation occurs in conjunction with summary judgment, our review is de novo.  *Tavai*, 176 Wn. App. at 135.

The children are not entitled to a spoliation inference.  The children contend that the defendants destroyed evidence of the children's memories of Shafer's molestation.  They argue

21

the defendants accomplished the destruction by not timely disclosing the potential molestation to their parents.

Spoliation applies to the destruction of evidence. *See Tavai*, 176 Wn. App. at 135. The children's contention that the defendants destroyed the children's memories is misplaced. First, the defendants did not possess or control evidence within the children's memories. Second, the defendants did not intentionally destroy any evidence. Finally, there is no evidence to support that the children at one time had memories of Shafer's molestation of them. Although the children's memories of molestation would clearly be important in this case, the children stretch spoliation too far when arguing that, because the children do not have memories of molestation, and because the defendants did not alert the parents of potential molestation quickly, the court should apply an inference of molestation in lieu of the missing memories. Because the defendants did not possess or control the potential evidence of the children's memories, and because the defendants did not destroy the children's memories, we hold that the children are not entitled to a spoliation inference.

IV. CROSS APPEAL: BIFURCATION

The defendants argue that the trial court abused its discretion when it declined to bifurcate the three children's cases. We disagree.

We review a trial court's determination on a motion to bifurcate for an abuse of discretion. *In re Det. of Mines*, 165 Wn. App. 112, 124, 266 P.3d 242 (2011). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds. *Det. of Mines*, 165 Wn. App. at 124.

Two rules address a trial court's ability to bifurcate claims or issues into separate trials. CR 20(b) states that a "court . . . may order separate trials or make other orders to prevent delay or prejudice." Similarly, CR 42(b) states:

> The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conductive to expedition and economy, may order a separate trial of any claim . . . or of any separate issue or of any number of claims . . . or issues, always preserving inviolate the right of trial by jury.

Bifurcation "should be carefully and cautiously applied and be utilized only in a case and at a juncture where informed judgment impels the court to conclude that application of the rule will manifestly promote convenience and/or actually avoid prejudice." *Brown v. Gen. Motors Corp.*, 67 Wn.2d 278, 282, 407 P.2d 461 (1965).[8] Bifurcation may result in piecemeal litigation, judicial inefficiency, and delays in the ultimate resolution of case. *Brown*, 67 Wn.2d at 282. Such piecemeal litigation is discouraged, especially where "the evidence bearing upon the respective issues is commingled and overlapping." *Brown*, 67 Wn.2d at 282. Bifurcation is not a procedure to be liberally applied, but its application remains in the discretion of the trial court. *Myers v. Boeing Co.*, 115 Wn.2d 123, 140, 794 P.2d 1272 (1990).

Here, the defendants made two motions to bifurcate. The trial court denied the motions. When denying the renewed motion, the trial court balanced judicial economy and convenience of the parties against prejudice to the defendants. The trial court stated that "where there's a common nucleus of facts or of liability or damage issues or when the issues are really interwoven, I think it's particularly important for judicial economy reasons and also for the

---

[8] *Brown* analyzes the predecessor rule to CR 42(b), which is practically identical to the current bifurcation rule set out in CR 42(b).

convenience of the parties to not grant a request for a separate trial or for bifurcation unless there is going to be great prejudice or serious prejudice to the defendant." Motion Hearing (April 22, 2016) at 16-17. The trial court balanced and weighed judicial economy and convenience against prejudice to the defendants. After considering these factors, the trial court denied the motion to bifurcate. This denial was not manifestly unreasonable or based on untenable grounds. Accordingly, we hold that the trial court did not abuse its discretion when denying the defendants' motion for bifurcation.

## ATTORNEY FEES

The children request attorney fees under RAP 14.3, RAP 18.1, RCW 4.84.185, and through equity. The children argue that we should award attorney fees because the defendants' arguments to the trial court were frivolous and because the defendants committed prelitigation misconduct. The defendants argue that the children failed to request attorney fees for the summary judgment and evidentiary motions to the trial court and, thus, waived that relief on appeal. Further, the defendants argue that the alleged prelitigation misconduct through spoliation is groundless. We decline to award attorney fees.

RAP 18.9 and RCW 4.84.185 allow this court to impose compensatory damages or sanctions against a party filing a frivolous appeal. An appeal is frivolous if "there are no debatable issues over which reasonable minds could differ and there is so little merit that the chance of reversal is slim." *Kearney v. Kearney*, 95 Wn. App. 405, 416, 974 P.2d 872 (1999). We may refuse to consider an issue on appeal that was not raised to the trial court. RAP 2.5(a).

We decline to award attorney fees based on frivolity because the defendants' claims have merit. Further, in responding to the defendants' motions for summary judgment dismissal and to

24

strike inadmissible evidence, the children did not request attorney fees. The children did not request attorney fees based on prelitigation misconduct at the trial court level. Regardless, the children's prelitigation misconduct argument is dependent on their unsuccessful spoliation claim. We deny the children's request for attorney fees.

CONCLUSION

In conclusion, we hold that the trial court did not err when striking Dr. Wynne's opinions and testimony under *Frye*. Further, we hold that the trial court did not err when granting the defendants' motion for summary judgment dismissal of G.G.'s and P.W.'s claims. However, summary judgment dismissal was improper for A.A. We also hold that the children are not entitled to a spoliation inference, and the trial court did not abuse its discretion when denying the defendants' motion to bifurcate. We deny the parties' requests for attorney fees. Accordingly, we reverse in part, affirm in part, and remand for further proceedings.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Worswick, P.J

We concur:

_____
Melnick, J.

_____
Cruser, J.

25