# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 60363-2-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| CHARLES C. HARTZELL, IV, | |
| Appellant. | |

CHE, J. — Charles Carroll Hartzell, IV, appeals his judgment and sentence for disclosing an intimate image.

Prior to trial, Hartzell, a dual citizen of the United States and Mexico, fled to Mexico. The trial court issued a nationwide bench warrant. Hartzell contends Mexican authorities kidnapped, tortured, forcibly trafficked him across the United States-Mexico border, and turned him over to the United States' Federal Bureau of Investigation (FBI). He asserts the Mexican authorities kidnapped Hartzell at the federal and state government's request and with their cooperation and assistance.

When Hartzell eventually returned to the trial court, he moved to dismiss the case under CrR 8.3 for governmental misconduct, but the trial court denied the motion. Hartzell, proceeding as a self-represented litigant, made multiple requests for access to public funds for investigative services. The trial court considered Hartzell's requests on the record with the State present during the proceedings. The trial court authorized Hartzell access public funds for investigative

No. 60363-2-II

services but controlled the total amount authorized and the allowable hourly rate for an investigator. The court also denied Hartzell's request for funds to transcribe witness interviews.

On appeal, Hartzell argues that (1) the State violated the United States–Mexico Extradition Treaty of 1978 (Extradition Treaty); (2) the trial court erred in failing to conduct an evidentiary hearing for Hartzell's CrR 8.3 hearing and denying the motion; and (3) the State violated Hartzell's rights under the Washington Constitution in his return from Mexico to the United States. Additionally, Hartzell argues that the State violated his *Brady*[1] rights by not providing him with documents relating to a surety company's motion to vacate a judgment of forfeiture. Finally, Hartzell argues that the trial court erred in denying some of his requests for investigative funds and violated his right to assistance of counsel in its consideration of Hartzell's requests.

We hold that (1) Hartzell's allegations regarding his return from Mexico is not a basis to reverse Hartzell's conviction or remand for an evidentiary hearing, (2) Hartzell fails to show that the State committed a *Brady* violation, and (3) although the trial court erred in considering Hartzell's requests for investigative funds on the record with the State present, Hartzell fails to show that the error substantially prejudiced his case.

Accordingly, we affirm.

FACTS

In October 2021, the State charged Hartzell with one count of first degree dealing in depictions of minors engaged in sexually explicit conduct, one count of second degree dealing in depictions of minors engaged in sexually explicit conduct, and one count of disclosing intimate

---

[1] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

2

images.  The charges were based on allegations that, in March 2021, Hartzell sent a third party a video of Hartzell having sex with the third party's wife, and two nude photographs of the wife, all of which had been taken years earlier when the wife was under the age of 18 years old. Hartzell stipulated to sending the photographs and the video.  The crimes of both first and second degree dealing in depictions of minors engaged in sexually explicit conduct were class B felonies while the crime of disclosing intimate images was a gross misdemeanor as it was Hartzell's first offense.  RCW 9.68A.050(1)(c), (2)(b); Former RCW 9A.86.010(7)(a) (2016).  The trial court issued a warrant for Hartzell's arrest[2] and set a $10,000 bond.

In January 2022, Hartzell posted bail and attended a first appearance and arraignment on the charges.  Two months later, Hartzell failed to appear for a status hearing.  The State told the trial court that Hartzell was currently on abscond status with the Department of Corrections (DOC) and that a municipal court had issued a warrant a couple weeks earlier.  The State requested a warrant with a bond of $200,000.  The court issued a bench warrant as requested.

In May, Hartzell returned to court on the bench warrant.  The State requested that the $200,000 remain as a condition of Hartzell's release prior to trial.  The trial court found that there were significant concerns about whether Hartzell would appear as directed or whether he would interfere with the administration of justice and, accordingly, set bail at $200,000.  The court set trial for the end of June.

In June, Hartzell requested a reduction in bail to $50,000.  The trial court lowered bail to $100,000.  At Hartzell's request, the court also continued trial until July.

___

[2] This first warrant spanned the states of Washington, Oregon, California, Idaho, and Montana. In November 2021, the State requested that the arrest warrant be amended after learning that Hartzell was incarcerated in Texas.  The trial court amended the arrest warrant to be nationwide.

An American surety company posted bond on behalf of Hartzell. For the next 10 months, Hartzell's case proceeded with Hartzell out of custody on bond.

Trial was scheduled for May 2023 after multiple continuances. At a status hearing in April, Hartzell appeared via video conferencing. At that time, he was on abscond status with the DOC and had an active warrant for his arrest. Hartzell told the court he was attending the hearing from his home in Port Townsend and was negotiating with DOC on a resolution. The trial court ordered Hartzell to appear before the court in person the next business day or appear from DOC custody.

Hartzell failed to appear the next business day so, at the State's request, the court struck the trial date and issued a bench warrant with a bail set at $1,000. The next day, Hartzell appeared in custody. The State requested bail be reset back to $100,000, and the court granted the request. A few days later, the court set a trial date for June.

A month later, Hartzell failed to appear for a status hearing. The trial court issued a bench warrant and set bail at $200,000, including the $100,000 previously posted. Because the surety company had information that Hartzell could be in the state of Georgia, the company requested a nationwide warrant, which the court thereafter issued. The State eventually sought forfeiture of the bond posted for Hartzell's bail. And, in August, the trial court ordered the posted bail forfeited and entered a judgment against Hartzell and the surety company.

Nearly a year later, Hartzell returned to custody on the bench warrant. The trial court set bail at $500,000, among other conditions of release. At Hartzell's request and after engaging in a colloquy with Hartzell, the court allowed Hartzell to proceed self-represented.

A.      *Motion for Dismissal and Objection To Jurisdiction Based on Governmental Misconduct*

Pretrial, Hartzell brought a series of motions, including a motion to dismiss under CrR 8.3(b) and an objection to jurisdiction based on allegations of governmental misconduct and violations of the Extradition Treaty.

According to Hartzell, leading up to his recent return on a bench warrant, Hartzell had been living in Mexico as a United States–Mexican dual citizen when he was captured by "Mexican special forces"[3] who brought him back to the United States. 1 Rep. of Proc. (RP) (Aug. 8, 2024) at 246. Agents "working on behalf of [the prosecutor] et al." illegally detained Hartzell for four hours; tortured him, including with water boarding; mock executed and threatened to kill and rape Hartzell's wife; and then forcefully trafficked Hartzell across the United States–Mexico border to the custody of the FBI. Clerk's Papers (CP) at 470. Hartzell stated that his wife was "disappeared" and his associate was also kidnapped, tortured, and terrorized by the same agents. CP at 156.

Hartzell asserted that his "extralegal rendition was done in coordination, and with the knowledge and assistance of" the FBI and multiple Washington county prosecutors, including the prosecutor in this case. CP at 469. And, that no order for an international arrest warrant, extradition, or deportation had been requested or issued. According to Hartzell, knowing they did not have an avenue to formally extradite him, groups from the United States, including the

---

[3] Hartzell alleged that the agents who captured him were "federal ministerial police special forces." Clerk's Papers (CP) at 469; *see also* 1 Rep. of Proc. (RP) (Aug. 8, 2024) at 246 ("Mexican special forces . . . brought me to the United States."). While Hartzell also alleged in a declaration that the ones who kidnapped him were "agents of Clallam County," we interpret this statement to mean that he believed the Mexican authorities were kidnapping him as agents for Clallam County and not Clallam County authorities. CP at 468. This is the only interpretation consistent with Hartzell's other representations to the trial court.

prosecutor and the Clallam County Sheriff's office, engaged in "a 'group effort' to track, locate, and capture" Hartzell. CP at 157.

As support for his allegations, Hartzell provided the trial court with his own declaration, a news article, an FBI media release stating that the FBI coordinated with Mexican authorities to bring Hartzell back to the United States, an inmate status information stating that "SW CRU[4] and Tacoma FBI tracked and had [Hartzell] arrested in Mexico," and an email from an FBI agent notifying various state officials—including the prosecutor in this case—that Hartzell "was arrested in Mexico." CP at 468 (Hartzell's declaration), 164 (news article), 166 (FBI media release), 179 (inmate status), 180 (FBI agent email).

Hartzell also provided the trial court with a declaration from a friend who lived in Texas but was visiting Hartzell in Mexico when Hartzell's alleged abduction occurred. The friend stated that she and Hartzell were driving in a town in Mexico close to the border when the car was surrounded by large trucks. Armed men "dressed in full tactical gear" removed Hartzell from the car and put Hartzell into one of their trucks. CP at 170. "That was the last time [the friend] saw [Hartzell]." CP at 170. The men then drove the friend in her car to another location closer to the border where, for hours, they questioned her about Hartzell, threatened her, and jabbed her with the barrels of their rifles before eventually "r[unning] to their vehicle and spe[eding] away." CP at 172.

The friend drove to the border to go home. At the border, she was taken into a customs facility and then an FBI agent and a United States Customs and Border Patrol (CBP) agent

---

[4] While not clear from the record, this appears to refer to Washington's DOC's Community Response Unit. *See Smith v. Dept' of Corr.*, 189 Wn. App. 839, 844 n.5, 359 P.3d 867 (2015) ("A CRU is responsible for cooperating with law enforcement to apprehend DOC violators.").

questioned her about Hartzell. While at the facility, she heard Hartzell's voice coming from a nearby room but did not see him.

When the friend eventually left the facility, it occurred to her that there could be a connection between what happened in Mexico and the questioning at the customs facility. She never mentioned what happened in Mexico to the FBI or CBP agent nor knew who the men were from the incident in Mexico.

> At no time had the men in [Mexico] ever identified themselves or offered any explanation as to why [Hartzell] & I were stopped and taken into custody. I had assumed it was a random event. We had been in the wrong place at the wrong time and had become the latest victims of the Mexican government. Now, I realized that [Hartzell] and I were not random victims at all. We were victims of a well-thought out and orchestrated plan to bring [Hartzell] to the US. The more I thought about it, the more things started making sense.

CP at 175.

The State did not assert that Hartzell had been extradited, deported, or arrested pursuant to an international warrant. Instead, the State maintained that a federal magistrate judge had signed a federal warrant for Hartzell's arrest after Hartzell was charged with one count of flight to avoid prosecution in federal court. Federal agents arrested Hartzell on that warrant at an international bridge in Texas. FBI documents received by the State noted Hartzell had stated that he "agreed to be returned to the United States by Fiscalia General de Justicia . . . officers," "was not deported," [and] "was kidnapped while in Mexico but was able to escape and was looking for his wife." CP at 185, 205, 328.

After Hartzell appeared in federal court for the federal charge, the United States dismissed the complaint. Afterward, the bench warrant for this case was served on Hartzell.

7

The State admitted it was aware that federal authorities believed Hartzell to be in Mexico prior to filing the federal charge and admitted it had provided documentation to the FBI to help them "obtain the necessary documentation to lawfully seize Hartzell." CP at 185. The prosecutor "was never given any reason to believe the federal authorities or the Mexican authorities would violate any laws when attempting to apprehend Hartzell." CP at 185.

Hartzell requested dismissal of his case with prejudice or an evidentiary hearing "in order to adduce more facts."[5] CP at 472. In a declaration, Hartzell attested that, in March 2024 the State had been aware that Hartzell had Mexican citizenship documentation and that the State had been aware that Hartzell's Mexican citizenship status and "warrant limitations" were preventing United States authorities from getting Hartzell out of Mexico. CP at 468. Hartzell asserted that the State was aware that Clallam County and other Washington county authorities were "part of a group effort to have Hartzell extradited from Mexico." CP at 468. He declared that he was kidnapped and trafficked by "agents of Clallam County." CP at 468.

The State opposed Hartzell's motion arguing, among other things, dismissal of a case is not warranted merely because of an illegal arrest and the court's authority to try a case is not impaired by a defendant being brought to the jurisdiction by even a "'forcible abduction.'" CP at

---

[5] Throughout the pretrial proceedings, Hartzell requested discovery related to his bench warrant return from the State. The State told Hartzell and the trial court it was seeking documentation related to Hartzell's return from Mexico, including from the federal government. At one point, Hartzell moved to compel the State to produce discovery related to his return. At a hearing on Hartzell's motion, the State represented that it had requested "[a]ny reports related to the capture and return of" Hartzell from the United States Department of Justice and the FBI. Given the State's outstanding request with those agencies, the trial court set over the matter. The trial court eventually denied Hartzell's motion to compel. Hartzell does not assign error to this decision on appeal.

187 (quoting *United States v. Sobell*, 244 F.2d 520 (2nd Cir. 1957)).  The trial court denied

Hartzell's motion to dismiss under CrR 8.3.  The court articulated three reasons for its denial:

> [Hartzell] can bring [a CrR 8.3 motion] based upon there being insufficient evidence to establish a prima facie case for the crime charged.  CrR 8.3(c).  There is sufficient evidence to bring these charges.
>     . . . .
> Under [CrR 8.3(b)], on motion of the court, a court may dismiss a criminal prosecution due to arbitrary action or governmental misconduct where there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial.  CrR 8.3(b).  It is not clear that [Hartzell] can initiate a motion under this rule provision.
>     . . . .
> If the court accepted as true the allegations regarding [Hartzell's] experience in Mexico and return to the United States, those actions would not materially affect his right to a fair trial in this matter.

CP at 134-35.

B.     *Requests for Investigative Funds*

During pretrial proceedings, Hartzell made several requests for funds for investigative

services after he became self-represented.  At Hartzell's request, the trial court appointed stand-

by counsel.

In June 2024, Hartzell requested "sufficient funds not to exceed $3,500 for the retention

and use of a c[riminal] defense investigator to aid in the preparation and execution of his defense

to the two class 'B' felony sex offenses."  CP at 461.  When the trial court addressed Hartzell's

request—on the record and in front of the State, the court stated:

> There's not an absolute right to somebody who's representing themselves for the Court to appoint an investigator. I will tell you that based upon what I have right now—I mean, I don't read [*State v. Silva*, 107 Wn. App. 605, 27 P.3d 663 (2001)] as an absolute prohibition against the Court appointing an investigator to help, you know, somebody who's representing themselves. I mean, I read it. But nor is the Court prepared to just give you a blank check to—so you probably need to refine that request.

1 RP (July 11, 2024) at 170-71.

The trial court then asked Hartzell to explain "exactly what you need and what you anticipate." 1 RP (July 11, 2024) at 171. Hartzell stated that he anticipated calling six witnesses and, before submitting his witness list, he needed to get a synopsis of what they would testify, "I'm certainly not going to do that over the jail phone, and I don't have any other access and means. . . . That's something . . . in the venue of an investigator." 1 RP (July 11, 2024) at 172. The trial court responded, "Well, with a little bit of trepidation here in saying what I'm about to say, is, you know, if you have witnesses that you plan to call, you know, giving that list to [stand-by counsel], and saying, hey, I need to speak with these, he can begin to work to try to have that." 1 RP (July 11, 2024) at 172. The court declined to appoint an investigator but stated, "if . . . somebody would tell me why and what [an investigator would be needed for], then I would review that." 1 RP (July 11, 2024) at 174.

The next day, Hartzell filed a memorandum to supplement his request, detailing proposed duties for an investigator. Hartzell sought an investigator to interview defense witnesses, "develop evidence to support an affirmative defense to the alleged crimes," interview law enforcement witnesses and develop evidence for Hartzell's CrR 8.3 motion, be available to testify for impeachment purposes, and assist Hartzell with trial proceedings, like setting up exhibits. CP at 431.

While on the record in open court, the following discussion occurred:

[TRIAL COURT]: There are various requests for an investigator.

Mr. Hartzell, I'm going to ask you a couple of questions, because it will help me to understand and decide this issue. One of your requests is because you want to develop evidence to support—to support an affirmative defense to the alleged crimes.

10

What are you talking about? What affirmative defense are you—

MR. HARTZELL: Count 1 and Count 2, the affirmative defense is that it's not—

[STAND-BY COUNSEL]: May I have a moment, Judge?

[TRIAL COURT]: Yeah.

(Discussion held off the record).

MR. HARTZELL: Your Honor asked for, in the last hearing, asked for clarification about the roles, the perspective duties of an investigator, so I did file my motion. I'm not familiar with the process for requesting an ex parte motion, but I feel like these are things that are—have more to do with my work product and that it would be something that I prefer to discuss ex parte, if the Court can do that. If not, you know, I don't necessarily have a problem talking about it in open court, but it goes a little bit towards work product.

[TRIAL COURT]: Well, I've already signed an order, as we sign in every single case, that requires a defendant to disclose the general nature of the defense, including whether there's an alibi, diminished capacity, those type of things. You're choosing to represent yourself, which you're allowed to do. It's not the case that the Court would appoint a pro se individual an investigator to track down every possible thing that might come to the mind of that person representing themselves. And, in fact, I think that's what . . . the case law would support that.

And so I don't know what it means to support an affirmative defense. If you have an affirmative defense, I think at some point you would be required to disclose that, would be the State's position—

[THE STATE]: Yes.

[TRIAL COURT]: —I'm sure. And so maybe the timing of that could be a different issue, but you're asking for funds to what, at this point, is to do I don't know what. And I'm not inclined, but I'm just giving you the opportunity if, for example, if you believe that there's something out there.

[HARTZELL]: Yes, Your Honor, and if I may. So the affirmative defense for Count[] 1 and Count 2 is it is not a defense that [I] did not know the age of the victim in the photograph. It is a defense that . . . [I] was in possession of no fact that would lead [me] to reasonably believe that the victim was under the age of 18. So that's the affirmative defense.

11

1 RP (July 18, 2024) at 201-03. Hartzell described wanting an investigator to collect "document[s], communication evidence, and then interviews of the people that were with us during [the time of the alleged crimes] to adduce if there was any facts that I was aware of that would lead me to reasonably believe that the person was under 18 years old." 1 RP (July 11, 2024) at 203.

The trial court ruled that it would appoint Hartzell an investigator "for the purposes of interviewing the witnesses identified by you and identified by the State." 1 RP (July 11, 2024) at 204. Given that Hartzell had stand-by counsel, the court declined to appoint Hartzell an investigator for setting up exhibits. The court also declined appointing Hartzell an investigator "to go to Mexico and interview what law enforcement in Mexico did or didn't do or those types of things." 1 RP (July 11, 2024) at 205. The court believed that Hartzell could request paperwork and documentation related to his return from Mexico to the same extent an investigator could. The trial court authorized up to 40 hours at the rate of $70 an hour for investigative services, with any additional expenses requiring court approval.

In August, Hartzell moved for modification of the authorized investigative services order, requesting an increased hourly rate and an increased total amount. Hartzell stated he was having trouble securing an investigator to interview defense witnesses.

At a hearing on the record and in open court, the trial court addressed subpoenas Hartzell had requested before turning to Hartzell's request for increased funds for an investigator. The following exchange occurred:

> [TRIAL COURT]: So—and we can handle those, I think, so one at a time. Why don't we start with the subpoenas. . . . one thing I don't have, which I believe that I need, would be something that would inform the Court of the need or the materiality of the testimony of these individuals, why compelling them to be here

is required, some indication that they're not going to appear voluntarily, but maybe most importantly is why are they even relevant to this case.

And so did you file something that I just haven't seen as to why each of these two, three—there's five—six individuals are material to your case?

MR. HARTZELL: So, thank you, Your Honor. So the difficulty that I'm having, obviously, is with the lack of an investigator. I provided the State with a synopsis summary of the proposed testimony of the witnesses, and one of the witnesses has provided [the State] a more detailed summary of her proposed testimony. I'm kind of at a point where we've been searching for an investigator for so long that we're three weeks from trial, and I don't—you know, I—ideally, I would have an investigator go and talk to these witnesses privately and get a summary of their testimony.

I've been able to speak to them casually, but, you know, obviously it's not something that I want—I don't want to do my defense investigation over the monitored telephone. I believe that all of these witnesses have material evidence to offer. I've supplied the State with a summary of the proposed testimony. One of the witnesses has provided testimony which I believe is mostly in line with the summary that I [provided the State].

[TRIAL COURT]: Did you give me a copy of that, by any chance?

MR. HARTZELL: I did not, Your Honor. I don't—I didn't—I don't—I didn't know that it was something I needed to do. I have a little bit of a hard time with having to play—I kind of feel like I'm having to play my cards open on the table, and I don't want to get too far into defense strategy, other than what I've already provided with [the State]. I don't know what the process is, Your Honor.

[TRIAL COURT]: Well, the Court's aware of that issue, and, you know, the sort of—what sometimes becomes conflicting rights; the right to represent yourself, the right of the State to have you incarcerated for the reasons previously articulated in this case, the difficulty that creates for you. The Court's ability to provide money for investigator, but we live in a world where people that do the work that we want to hire them for isn't always available, whether it be a dentist or an investigator or a veterinarian or whatever.

And—but—and in this case, your right to, you know, compulsory process clause, I think, guarantees you the right under the 14th and 16th Amendments to compel somebody to testify. That's inherent in your right, confrontation, but it's not the case that that right is unlimited. And it's not the case that the Court's just going to issue a bunch of subpoenas to people without having some sense of why that is.

It sounds like you've provided the State a summary of their testimony. That would be the one that would maybe be more prejudicial, because I don't—you know, I'm not ultimately going to rule on your guilt or innocence in this case. A jury will make that determination. But—but, I mean, I can go through them. Do we have a written summary that—

[THE STATE]: I don't have. I didn't bring what Mr. Hartzell has provided to the Court so that the Court could make a determination whether it's sufficient.

[TRIAL COURT]: Does the State have a position, just out of curiosity, to—on these? I mean, you're—I mean, at trial, the State would have a right to object—

[THE STATE]: Yes.

[TRIAL COURT]: —as to relevance.

[THE STATE]: Yes.

[TRIAL COURT]: Or any number of things. . . . I'm trying to narrow the issues a little bit.

[THE STATE]: Well, I mean, and [one of the requested subpoenas] could be the cumulative—I've been given a very generic summary of what all the witnesses will testify . . .

1 RP (Aug 15, 2024) at 275-79. The court, the State, and Hartzell then discussed the potential relevance and anticipated testimony of witnesses Hartzell sought to subpoena.

Hartzell again stated he was having difficulty communicating with the witnesses because his phone calls discussing his defense were being listened to, his calls could become discovery, and he did not want to be accused of tampering with a witness or providing a witness with information. 1 RP (Aug. 15, 2024) at 283-84. Upon hearing that, the trial court interrupted Hartzell "to shift gears for a minute" and asked Hartzell's stand-by counsel whether he could find an investigator to interview Hartzell's witnesses if the hourly rates were raised. 1 RP (Aug. 15, 2024) at 284. Stand-by counsel responded that he was hopeful they could and that one

14

investigator had previously declined the prior fee rate due to the requirement of working with a self-represented litigant.

The trial court modified its order authorizing Hartzell funds for investigative services by increasing the hourly rate to $120 per hour. However, the trial court kept the total authorized amount the same. The court estimated that, even if the investigator spent two hours with each witness and then spent two to three hours doing other tasks, Hartzell would still be below the total authorized amount. The court noted that, while it was maintaining the total authorized amount, the amount was "subject to modification upon a showing of necessity by defense prior to expenditure of same." CP at 253. With the increased hourly rate, Hartzell was able to hire an investigator to conduct witness interviews.

A few days later, Hartzell brought an ex parte motion, requesting additional expert funds to have some witness interviews transcribed. On the record before all parties, the trial court discussed Hartzell's request with Hartzell and his stand-by counsel. Hartzell requested the funds so transcripts of witness interviews would be available for questioning and impeachment purposes at trial. He stated that he only had limited access to audio recordings of the interviews while in the jail. When the court noted that they had previously discussed Hartzell having access to discovery if he were to move to a segregation cell, Hartzell acknowledged that he had the opportunity to move to such cell but decided against it due to other access he would lose, including phone and texting device to communicate with stand-by counsel and the investigator, and his access to the law computer would be reduced to one hour.

The State was present for the discussion of Hartzell's request but only participated in the discussion by confirming that Hartzell had access to the recordings of the State's witnesses.

15

Ultimately, the trial court denied Hartzell's request, noting that Hartzell still had a couple weeks before trial and stating that Hartzell could use the already existing audio and video recordings of the interviews to take notes for trial purposes.

A few days before trial, Hartzell requested additional funds for an investigator to conduct a 15-minute interview of one of the State's witnesses. However, given the proximity to trial and Hartzell's preference to proceed with the trial as scheduled, Hartzell agreed to forgo having an investigator participate in the witness interview as long as the State recorded the interview.

C.      *Surety Company's Motion To Vacate Forfeiture of Bail*

Before Hartzell's trial, the surety company that had posted and forfeited Hartzell's $100,000 bail bond moved to vacate the judgment forfeiting the bond and requested the return of the bail money. Attached to the motion was a letter from the FBI and a statement from a bail recovery agent who was contracted by the surety company to find Hartzell. The recovery agent's statement asserted that they had narrowed Hartzell's location to a city in Mexico, Hartzell texted the recovery agent multiple times, and an individual sought reward money to turn in Hartzell. The FBI letter stated that the bail recovery agent agreed to help the FBI with locating and apprehending Hartzell by providing the FBI with information they had on Hartzell. The letter also stated that, "[t]he information that [the recovery agent] provided was used in conjunction with other information gathered during the course of the investigation to successfully locate, apprehend, and extradite Hartzell back to Clallam County." Suppl. CP at 569.

The trial court granted the surety company's motion for return of the bail money and vacated the forfeiture judgment.

16

A jury found Hartzell not guilty of the two counts for dealing in depictions of minors engaged in sexually explicit conduct but found him guilty of one count of disclosing intimate images. The trial court sentenced Hartzell to 364 days of confinement.

Hartzell appeals.

## ANALYSIS

### I. RETURN FROM MEXICO

Hartzell argues that reversal or remand for an evidentiary hearing is required due to the federal and state government's conduct in his return to Washington. First, Hartzell claims that the Extradition Treaty should have controlled Hartzell's return from Mexico and that the State violated the treaty by failing to formally extradite Hartzell. Next, Hartzell argues that both the federal and state government were complicit in Hartzell's torture and extraction from Mexico and that, given Hartzell's declaration regarding those events, Hartzell was owed an evidentiary hearing on his CrR 8.3 motion to dismiss. Accordingly, Hartzell argues that the trial court erred in denying his CrR 8.3 motion. Finally, Hartzell argues that his unlawful arrest and transport out of Mexico violated article I, section 7 of the Washington Constitution. We address each of Hartzell's arguments in turn below.

A.     *Hartzell Fails To Show That the Extradition Treaty Applies*

Hartzell states that, while lawfully living in Mexico, he was kidnapped and tortured by Mexican authorities who eventually returned him to the FBI in Texas. Neither Hartzell nor the State assert that Hartzell was returned to the United States through extradition proceedings. Nevertheless, Hartzell argues that the State violated the Extradition Treaty because the State

failed to receive Mexico's permission to prosecute him for any of his pending charges in Washington. We disagree.

Hartzell argues that the State violated the Extradition Treaty under the "rule of specialty." Br. of Appellant at 23. The rule of specialty, or specialty doctrine, prohibits a requesting nation from prosecuting an extradited defendant for crimes that are different than those for which the rendering nation explicitly granted extradition. *State v. Pang*, 132 Wn.2d 852, 902, 940 P.2d 1293 (1997). The doctrine "'is designed to prevent prosecution for an offense for which the person would not have been extradited.'" *Id.* (quoting Rest. (Third) of Foreign Relations Law of the United States § 477 (cmt. b) (1987)).

However, for the specialty doctrine to apply, there must have been "formal extradition proceedings" pursuant to a valid extradition treaty. *See United States v. Valot*, 625 F.2d 308, 310 (9th Cir. 1980). In *Valot*, the United States Court of Appeals' Ninth Circuit reaffirmed its prior holding that "w[h]ere no demand for extradition is made by the United States and the defendant is deported by the authorities of the other country which is party to the treaty, no 'extradition' has occurred and failure to comply with the extradition treaty does not bar prosecution." *Id*. The Ninth Circuit held that, because a defendant was delivered by Thai authorities to United States federal agents at a Bangkok airport, no extradition treaty violation occurred, and the extradition treaty did not bar the defendant's conviction in the United States. *Id*. Neither deportation nor surrender other than in response to a demand pursuant to a treaty constitutes an extradition. *Id.*; *see also Oen Yin-Choy v. Robinson*, 858 F.2d 1400, 1404 (9th Cir. 1988).

Here, neither Hartzell nor the State claims that Hartzell was returned to the United States through formal extradition proceedings or that the United States made any demand for Hartzell's

return pursuant to the Extradition Treaty. With no extradition, the rule of specialty does not apply. *Valot*, 625 F.2d at 310. Accordingly, Hartzell fails to show that the State violated the Extradition Treaty under this doctrine.

Hartzell also appears to argue that the State violated the Extradition Treaty by "collu[ding] or conspir[ing]" with the agents who kidnapped him. Br. of Appellant at 30. Hartzell asserts that the Mexican government would not have permitted Hartzell to be extradited because he was a dual-citizen and given the nature of his underlying charges. However, per Hartzell's own understanding of how he was returned, Hartzell was captured and brought to the United States by Mexican authorities. Thus, we are not persuaded by Hartzell's argument.

While an extradition treaty may impose an obligation for a nation to surrender someone within their jurisdiction under certain circumstances, the extradition treaty does not provide the exclusive means to return the individual. *See United States v. Alvarez-Machain*, 504 U.S. 655, 664, 112 S. Ct. 2188, 119 L. Ed. 2d 441 (1992). And while an extradition treaty creates a legal right to demand extradition—and a correlating duty to surrender—under certain circumstances, a sovereign nation:

> may, if agreeable to its own constitution and laws, voluntarily exercise the power to surrender a fugitive from justice to the country from which he had fled . . .

*Factor v. Laubenheimer*, 290 U.S. 276, 287, 54 S. Ct. 191, 78 L. Ed. 315 (1933) (internal citations omitted).

Hartzell makes no allegations that Mexico turned him over involuntarily. Additionally, there are no facts in the record to show that Mexico ever objected to Hartzell's return. Instead, per Hartzell's version of events, the sovereign nation voluntarily exercised its authority to surrender Hartzell to the United States. The nation's right to do so is one long recognized as a

19

sovereign right and practice of comity. *See Commonwealth ex rel. Short v. Deacon,* 10 Serg. & Rawle 125 (Pa. 1823) ("Every nation has an undoubted right to surrender fugitives from other states; no man has a right to say, I will force myself into your territory, and *you shall protect me.*"); *United States v. Rauscher*, 119 U.S. 407, 411-12, 7 S. Ct. 234, 30 L. Ed. 425 (1886) ("Prior to . . . treaties, and apart from them, . . . [delivery of fugitives] was often made . . . upon the principle of comity, and within the discretion of the government whose action was invoked.").

Even if the Mexican government would not have extradited Hartzell upon the United States' formal request, here Mexican authorities nevertheless returned Hartzell to the United States per Hartzell's own version of events. A sovereign nation has the right to voluntarily return Hartzell to the United States separate from an extradition procedure.

Moreover, under *Alvarez-Machain*, Hartzell's allegations would not be a violation of the Extradition Treaty. In *Alvarez-Machain,* the Supreme Court considered whether a transborder abduction across the United States-Mexican border outside of extradition proceedings would violate the same treaty at issue here. 504 U.S. at 662. Alvarez-Machain was forcibly kidnapped and turned over to United States Drug Enforcement Administration officials who were responsible for his abduction though not involved personally in it. *Id.* at 657. Mexico protested against Alvarez-Machain's abduction and requested that the United States extradite the individuals suspected of abducting Alvarez-Machain. *Id.* at 669, n.16. Considering the treaty's language and its history, the Supreme Court concluded that Alvarez-Machain's abduction was not in violation of the Extradition Treaty. *Id.* at 666, 670.

Hartzell attempts to distance *Alvarez-Machain*'s holding by noting certain groups' disapproval of the decision and a later unratified treaty between the United States and Mexico prohibiting transborder abductions. However, as Hartzell acknowledges, the signed treaty never came into force. *See United States v. Struckman*, 611 F.3d 560, 572 n.6 (9th Cir. 2010); United States Dep't of State, Treaties in Force, 281-93 (2025), https://www.state.gov/wp-content/uploads/2025/08/Treaties-in-Force-2025-final.pdf. Moreover, Hartzell makes no other argument nor cites any authorities showing that *Alvarez-Machain*'s holding no longer applies. "'Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none.'" *State v. Chhim*, 35 Wn. App. 2d 238, 270, 574 P.3d 595 (2025) (quoting *State v. Logan*, 102 Wn. App. 907, 911 n.1, 10 P.3d 504 (2000)).

Hartzell's claim that the State violated the Extradition Treaty fails because, under this record, such treaty did not apply to the circumstances of Hartzell's return.

B.      *The Trial Court Did Not Err in Its CrR 8.3 Motion*

Prior to trial, Hartzell raised his allegations of kidnapping, torture, and other abuses in a CrR 8.3 motion to dismiss the case for governmental misconduct. The trial court denied Hartzell's motion, concluding, among other things, that Hartzell failed to show that his allegations would materially affect his right to a fair trial in the case. Hartzell argues that the trial court erred in not granting him an evidentiary hearing for the motion and also erred in denying the motion. Furthermore, Hartzell argues that the State violated his *Brady* rights by failing to disclose certain documents Hartzell contends would have supported his CrR 8.3 motion. We disagree.

21

Former CrR 8.3(b) permits a trial court to, "in the furtherance of justice, after notice and hearing, . . . dismiss any criminal prosecution due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial."[6]  To support dismissal, the defendant must show (1) "arbitrary action or governmental misconduct" and (2) "actual prejudice affecting [the defendant's] fair trial rights." *State v. Oppelt*, 172 Wn.2d 285, 297, 257 P.3d 653 (2011).  The defendant must make such a showing by the preponderance of the evidence.  *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003).

We review a trial court's decision under CrR 8.3(b) for abuse of discretion.  *Oppelt*, 172 Wn.2d at 297.  The trial court abuses its discretion if its "'decision is manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons.'"  *Rohrich*, 149 Wn.2d at 654 (quoting *State v. Blackwell*, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993)).

Hartzell relies solely on *United States v. Toscanino*, 500 F.2d 267 (2nd Cir. 1974), to support his arguments that the trial court erred in concluding that Hartzell failed to show that the State's alleged conduct materially affected his right to a fair trial and that the trial court should have conducted an evidentiary hearing.

---

[6] We cite to the court rule in effect at the time of the trial court's decision.  Effective September 1, 2025, CrR 8.3(b) now requires a court to consider the following factors, as well as "any other information the court believes is relevant," in considering whether to dismiss:

> (1) the seriousness and circumstances of the offense;
> (2) the impact of a dismissal or lack of dismissal on the safety or welfare of the community (the defendant is part of the community);
> (3) the impact of a dismissal or lack of dismissal upon the confidence of the public in the criminal justice system;
> (4) the degree and impact of the arbitrary action or governmental misconduct.

In *Toscanino*, a defendant alleged that United States agents forcibly abducted him from Uruguay and brought him back to the United States to face a federal charge. *Id.* at 268-70. Toscanino stated that, during his abduction and return to the United States, the agents pistol-whipped, bound, blindfolded, tortured, interrogated for 17 days, and finally drugged and flew him back to the United States. *Id.* at 269-70. Toscanino alleged that an assistant United States attorney knew of his torture and interrogation and that a United States Department of Justice official was present and participated in his interrogation. *Id.* at 270.

The United States Court of Appeals Second Circuit noted that federal courts had historically followed the "'Ker-Frisbie' rule" where "the government's power to prosecute a defendant is not impaired by the illegality of the method by which it acquires control over him." *Id.* at 271-72 (citing to *Ker v. Illinois*, 119 U.S. 436, 7 S. Ct. 225, 30 L. Ed. 421 (1886) and *Frisbie v. Collins*, 342 U.S. 519, 72 S. Ct. 509, 96 L. Ed 541 (1952)). The *Toscanino* court reasoned that the Ker-Frisbie rule limited due process for a criminal defendant to "the guarantee of a constitutionally fair trial, regardless of the method by which jurisdiction was obtained over the defendant." 500 F.2d at 272. But, through analyzing later Supreme Court cases that expanded due process to pretrial conduct of law enforcement authorities—e.g., cases concerning the exclusionary rule[7], the *Toscanino* court reasoned that:

> due process . . . now requir[es] a court to divest itself of jurisdiction over the person of a defendant where it has been acquired as the result of the government's deliberate, unnecessary and unreasonable invasion of the accused's constitutional rights.

*Id.* at 275.

---

[7] The federal exclusionary rule concerns illegally obtained evidence. *State v. Mayfield*, 192 Wn.2d 871, 874, 434 P.3d 58 (2019).

Invoking the federal court's supervisory powers over the administration of criminal justice, the court concluded that, if Toscanino's allegations of government misconduct were sustained, Toscanino would be entitled to some relief pursuant to due process. *Id.* at 275-76. Accordingly, the Second Circuit remanded to the district court for an evidentiary hearing but "only if . . . [Toscanino] offers some credible supporting evidence, including specifically evidence that the action was taken by or at the direction of United States officials." *Id.* at 281.

Although *Toscanino* effectively created an exception to the Ker-Frisbie doctrine, "attempts to expand due process rights into the realm of foreign abductions, as the Second Circuit did in [*Toscanino*], have been cut short" by subsequent United States Supreme Court precedent. *United States v. Matta-Ballesteros*, 71 F.3d 754, 763 (9th Cir. 1995) (citing to *Alvarez-Machain*, 504 U.S. at 662). In addition to holding that Alvarez-Machain's abduction did not violate the Extradition Treaty, the Supreme Court also held that, if an abduction is not in violation of an extradition treaty, the Ker-Frisbie rule applies and a court is not required to inquire how a defendant came to be before it. *Alvarez-Machain*, 504 U.S. at 662.

Although Hartzell relies on *Toscanino* on appeal, he made no argument nor presented evidence below as to how the State's alleged actions would amount to "actual prejudice affecting his fair trial rights" in light of the Ker-Frisbie rule. *Oppelt*, 172 Wn.2d at 297. Former CrR 8.3 required Hartzell to establish actual prejudice affecting his right to a fair trial by the preponderance of the evidence. *Rohrich*, 149 Wn.2d at 654. Based on the record before the trial court, the facts underlying *Toscanino*, and *Alvarez-Machain*'s subsequent narrowing of *Toscanino*'s expansion, the trial court did not abuse its discretion in concluding that Hartzell failed to show actual prejudice to his fair trial rights.

The worst conduct Hartzell alleged the State participated in was requesting Hartzell's return from Mexico and providing information to secure his return. Hartzell appears to argue that, because the State knew of Hartzell's Mexican citizenship, of his address, and that there was no extradition order, the State committed governmental misconduct by trying to get Hartzell returned through other avenues. Even if *Toscanino* as applied to foreign abductions survived *Alvarez-Machain*, Hartzell's allegations of government misconduct are clearly distinguishable from the direct and deliberate involvement of the government actors in *Toscanino*. *See Toscanino*, 500 F.2d at 269-70.

Although Hartzell asserted the Mexican agents who tortured, threatened, and abducted him did so as agents of the United States and the State, Hartzell provided no evidence to support his bare allegation. The record shows that the FBI, the prosecutor, and other state officials were aware that the federal government was working with Mexican authorities to return Hartzell to the United States, that the federal and state officials were in communication to some degree to coordinate Hartzell's return, and that the officials eventually became aware of Hartzell's arrest in Mexico. However, Hartzell provided no evidence that either federal or state officials directed or even knew of the Mexican authorities' alleged mistreatment of Hartzell while returning him to the United States. Even Hartzell's friend who witnessed Hartzell's capture stated that the agents never identified themselves, the agents never told her nor Hartzell why they were taking Hartzell, and she only suspected some involvement by the United States government because of her later questioning at the border by the FBI and CBP agents. Accordingly, even under *Toscanino*, the record does not support Hartzell having a right to an evidentiary hearing because he did not offer—nor does he indicate he could offer—evidence that the torture, threats, and interrogation

25

in Mexico was directed by United States or state officials. *See id.*, 500 F.2d at 281 (evidentiary hearing warranted "only if . . . [Toscinino] offers some credible supporting evidence, including specifically evidence that the action was taken by or at the direction of United States officials.").

Our conclusions above also defeat Hartzell's claim that a *Brady* violation occurred. Hartzell argues that the State violated *Brady* by not sending Hartzell his surety company's motion to vacate the judgment forfeiting the bond and the motion's attached supporting documents. A *Brady* violation occurs "when a prosecutor suppresses 'evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *In re Pers. Restraint of Mulamba*, 199 Wn.2d 488, 497, 508 P.3d 645 (2022) (quoting *Brady*, 373 U.S. at 87). To be "material," the evidence must have a "'reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* at 498 (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985)).

Hartzell appears to argue that the evidence was material because it would have strengthened Hartzell's claim of governmental misconduct. He asserts that the documents would have provided a "connecting piece of information that the reason [Hartzell] was located in Mexico was because agents of the State — the bond company — had information on his whereabouts, and they conveyed that information to the federal government so the federal agents could bring Mr. Hartzell back to Washington State to face State — not federal — charges." Br. of Appellant at 52.

However, none of this evidence indicates that the torture, threats, and interrogation in Mexico was directed by United States or state officials. *See Toscanino*, 500 F.2d at 281. At

most and like the evidence Hartzell already provided, the evidence only suggests that the surety company knew of Hartzell's location and conveyed that information to the federal government. There is no "'reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different;'" therefore, the evidence was not "material" evidence. *Mulamba*, 199 Wn.2d at 498 (quoting *Bagley*, 473 U.S. at 682). Furthermore, any evidence of federal or state involvement in Hartzell return from Mexico was not relevant to Hartzell's guilt or punishment for this case. Under these facts, no *Brady* violation occurred.

Finally, Hartzell's argument that the trial court erred in not providing him with an evidentiary hearing fails because the plain language of former CrR 8.3(b) indicates that Hartzell was owed a "hearing," which Hartzell undisputedly received. Not only did the trial court hold a hearing, it also considered evidence the parties attached to their briefings. In its ruling, the trial court stated, "If the court accepted as true the allegations regarding [Hartzell's] experience in Mexico and return to the United States, those actions would not materially affect his right to a fair trial in this matter." 1 RP (June 21, 2024) at 135. Under these circumstances and with Hartzell relying on no case other than *Toscanino* to argue that he was owed an evidentiary hearing for his allegations, Hartzell fails to show that the trial court erred in it's CrR 8.3(b) hearing. *See Chhim*, 35 Wn. App. 2d at 270 ("'Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none.'") (quoting *Logan*, 102 Wn. App. at 911 n.1).

The trial court did not err in holding its CrR 8.3 hearing nor did the trial court abuse its discretion in denying Hartzell's CrR 8.3 motion. Additionally, the State did not violate

Hartzell's *Brady* rights by not disclosing to him documents from Hartzell's surety company's motion to vacate the judgment forfeiting the bond.

C.      *Hartzell Fails to Show that His State Constitutional Rights Were Violated*

Finally, Hartzell argues that his arrest and transport out of Mexico violated his rights under the Washington Constitution. Hartzell acknowledges that the Ker-Frisbie rule applies in the federal context. But, because article I, section 7 of state constitution provides greater protections than those provided by the Fourth Amendment, Hartzell asks us to not accept the federal rule and reverse his conviction due to the alleged illegal arrest. Because we are bound by precedent and a long-standing practice in our state of applying the Ker-Frisbie rule, we decline.

We review constitutional issues de novo. *State v. Armstrong*, 188 Wn.2d 333, 339, 394 P.3d 373 (2017).

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Relatedly, article I, section 7 of the Washington Constitution provides, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law."

Hartzell is correct that our courts have "long recognized this provision is more protective of individual privacy than the Fourth Amendment." *State v. McGee*, 3 Wn.3d 855, 865, 557 P.3d 688 (2024). Although our state has certainly diverged from federal jurisprudence as it pertains to the Exclusionary Rule,[8] we are not persuaded that, even if a constitutional violation occurred through an illegal arrest in a foreign country, our constitution requires reversal of a conviction.

---

[8] *See Mayfield*, 192 Wn.2d at 883-88 (providing a thorough history of the exclusionary rule in Washington State).

Washington courts have long and consistently applied the Ker-Frisbie rule, refusing to deprive a court of the power to exercise its jurisdiction over an individual present before it merely because of the manner in which they are brought to the court.[9]

As our Supreme Court has unequivocally stated:

Where, for any reason, an arrest is invalid, but the defendant enters a plea of not guilty and is in court on the day of trial, the court has jurisdiction of his person. . . . Where the court has jurisdiction of the person of a defendant, it is not a ground for quashing or dismissing a criminal prosecution that he was not lawfully arrested.

*State v. Bowman*, 69 Wn.2d 700, 703, 419 P.2d 786 (1966) (quoting *State v. Ryan*, 48 Wn.2d 304, 305, 293 P.2d 399 (1956)).  Instead, "[i]t is the admission of evidence obtained incident to or as a result of illegal activity which can upset the conviction."  *State v. Kennedy*, 8 Wn. App. 633, 636, 508 P.2d 1386 (1973).

Hartzell attempts to overcome *Bowman*'s holding by distinguishing his case from the facts at issue in *Bowman* and noting that the opinion has been cited limitedly in recent years. Given *Bowman*'s broad and unequivocal statement that the rule applies for an arrest invalid "for any reason," we are bound by this enunciated principle of law until our Supreme Court holds otherwise.  *State v. Brown*, 13 Wn. App. 2d 288, 291, 466 P.3d 244 (2020) ("[A] decision by the Washington Supreme Court is binding on all lower courts of the state."); *State v. Gore*, 101 Wn.2d 481, 487, 681 P.2d 227 (1984) ("[O]nce [the Washington Supreme Court] has decided an

---

[9] *See e.g., State v. Waters*, 93 Wn. App. 969, 976, 971 P.2d 538 (1999) (arrested on reservation and forcibly returned to the state); *State v. Bonds*, 98 Wn.2d 1, 14, 653 P.2d 1024 (1982) (summary return from another state without extradition); *City of Pasco v. Titus*, 26 Wn. App. 412, 416, 613 P.2d 181 (1980) (illegal arrest); *Ollison v. Rhay*, 68 Wn.2d 137, 139, 412 P.2d 111 (1966) (illegal and irregular extraditions); *Davis v. Rhay*, 68 Wn.2d 496, 498-99, 413 P.2d 654 (1966) (returned from another state under duress); *State v. Lemons*, 53 Wn.2d 138, 140, 331 P.2d 862 (1958) (illegal arrest); *State v. Ditmar*, 132 Wash. 501, 505, 232 Pac. 321 (1925) (arrest without a lawful warrant); *State v. Melvern*, 32 Wash. 7, 12, 72 Pac. 489 (1903) (same).

issue of state law, that interpretation is binding on all lower courts until it is overruled by [the Washington Supreme Court].").  Hartzell cites no controlling precedent purporting to overrule or diverge from our Supreme Court's prior holdings.  *See Chhim*, 35 Wn. App. 2d at 270.  Hartzell fails to show that his allegations warrant reversing his conviction under our state constitution.

## II.  INVESTIGATIVE FUNDS

Hartzell claims that the trial court abused its discretion and violated Hartzell's state and federal constitutional rights to assistance of counsel in its consideration and rulings on Hartzell's requests for investigative funds.  He argues that these errors require reversal.  We disagree.

A.      *Legal Principles*

Under the Sixth Amendment, a criminal defendant has a right to effective assistance of counsel, including a right to "expert assistance necessary to an adequate defense." *State v. Punsalan*, 156 Wn.2d 875, 878, 133 P.3d 934 (2006).  Under article I, section 22 of the Washington Constitution, a pretrial detainee who has exercised their constitutional right to represent themselves has "a right of reasonable access to state provided resources that will enable [them] to prepare a meaningful pro se defense," including access to necessary investigative services. *Silva*, 107 Wn. App. at 622-23.

Washington discharges its constitutional obligations as they pertain to necessary expert assistance through a court rule, CrR 3.1(f). *Punsalan*, 156 Wn.2d at 878; *see State v. Kelly*, 102 Wn.2d 188, 200, 685 P.2d 564 (1984).  This rule "controls the authorizations of funds for services other than counsel." *Kelly*, 102 Wn.2d at 200.  CrR 3.1(f) provides, in pertinent parts:

(1) A lawyer for a defendant who is financially unable to obtain investigative, expert, or other services necessary to an adequate defense in the case may request them by a motion to the court.

30

(2) Upon finding the services are necessary and that the defendant is financially unable to obtain them, the court, or a person or agency to whom the administration of the program may have been delegated by local court rule, shall authorize the services. The motion shall[10] be made ex parte, and, upon a showing of good cause, the moving papers may be ordered sealed by the court, and shall remain sealed until further order of the court. . . .

(3) Reasonable compensation for the services shall be determined . . .

CrR 3.1(f) (footnote added).

"There is no authority holding that the right of self-representation embodies a right to have an investigator assigned to the defendant." *Silva*, 107 Wn. App. at 624. However, a trial court may determine that the services of an investigator are constitutionally required "to ensure adequate preparation of a meaningful pro se defense . . . after considering the needs of the case." *Id*. Whether the services are necessary or appropriate "lie within the sound discretion of the trial court" after the court has considered all circumstances including:

the nature of the charge, the complexity of the issues involved, the need for investigative services, the orderly administration of justice, the fair allocation of judicial resources (i.e., an accused is not entitled to greater resources than he would otherwise receive if he were represented by appointed counsel), legitimate safety and security concerns, and the conduct of the accused.

---

[10] This portion of the court rule was amended in 2021 from "may" to "shall."  4A Elizabeth A. Turner, *Washington Practice, Rules Practice* CrR 3.1 authors' cmts. (May 2026, 8th ed.).  The Washington Defender Association (WDA), who proposed the amendment, included the following comment, in part, with their proposal:

WDA has heard from defenders who have requested expert funds ex parte only to have judges invite prosecutors to weigh in on their requests, which allows opposing counsel a preview of the defense's trial strategy. The changes we propose would eliminate that practice and any chilling effect it may have on defenders considering requests for expert funds. Such changes would also lead to a more uniform administration of justice throughout the state, since currently some judges seek prosecutorial input on defense requests for expert funding while others do not.

4A *Wash. Prac. Rules Practice* CrR 3.1.

*Id*. at 623 (footnotes omitted).

Accordingly, we review a trial court's decision regarding authorizing investigative funds for an abuse of discretion. *Kelly*, 102 Wn.2d at 201. We additionally consider whether the defendant was substantially prejudiced by the lack of an investigator. *State v. Young*, 125 Wn.2d 688, 691, 888 P.2d 142 (1995) (ruling on expert services "shall not be overturned absent a clear showing of substantial prejudice.").

B.      *Hartzell's Arguments Fail*

Hartzell argues that the trial court abused its discretion in both its ultimate decisions regarding Hartzell's requests and, procedurally, its consideration of those requests.

First, Hartzell contends that the trial court pushed back constantly on Hartzell's requests, despite authorizing some funds. Hartzell argues that this abuse of discretion is evident by the trial court's decision that, even after Hartzell told the court that he was struggling to find a local investigator, it would only authorize an increase in the hourly rate of an investigator and would keep the total authorized amount the same.

It is true the trial court, at one point, modified its order authorizing investigative services to increase the authorized hourly rate for an investigator but maintained the total amount of such services. However, the court did so after estimating that the prior authorized total amount would be sufficient to meet Hartzell's investigatory needs. The court also noted that the total amount was subject to modification if Hartzell showed that more funds were required. Hartzell ultimately succeeded in finding an investigator to interview witnesses and did not request modification of the total authorized amount until new evidence arose right before trial.

Hartzell points additionally to the trial court's denial of his request for funds to have witness interviews transcribed as an example of the court "push[ing] back." Br. of Appellant at 55. In discussing this request, Hartzell told the court that he had access to audio recordings of the interviews but only had access to them for limited hours during the day. Hartzell admitted that he could have taken an opportunity to have unlimited access to the recordings by moving to a segregation cell but declined to because he did not want to lose access to other resources. In denying Hartzell's request, the trial court noted that Hartzell still had a couple weeks before trial and could prepare notes so to question and impeach witnesses at trial using the audio recordings Hartzell had access to.

When looking at Hartzel's overall requests, the court inquired into necessary circumstances related to authorizing services. When Hartzell first requested funds for investigative services, the trial court granted the request after inquiring into the necessity of such services. When Hartzell asked the court to modify its authorization of funds, the court did so to the extent it believed was necessary per Hartzell's specific request and left open the possibility of future modifications. The only time when the trial court outright denied Hartzell's request for funds, the court did so after confirming that Hartzell had access to the items at the heart of his request. From a review of the record, instead of pushing back on Hartzell's requests, it appears that the trial court exercised its discretion to fully consider the circumstances of Hartzell's requests as required when considering access to public funds for investigative services. *See Silva*, 107 Wn. App. at 622-24 ("What measures are necessary or appropriate to constitute reasonable access lie within the sound discretion of the trial court after consideration of all the circumstances . . . Whether an investigator must be appointed to ensure adequate preparation of a

meaningful pro se defense must be determined by the trial court after considering the needs of the case.").

Next, Hartzell asserts that the trial court impermissibly required Hartzell to explain the bases for his requests in front of the State and at one point engaged the State in evaluating whether one of Hartzell's requests for funds was appropriate. Contrary to Hartzell's view of the record, the record does not indicate that the trial court asked the State to evaluate whether one of Hartzell's requests for investigative funds was appropriate. Instead, it appears that the trial court was in the process of considering Hartzell's requests for multiple subpoenas when it asked whether the State had a position.

However, Hartzell is correct that, from the record, the trial court considered all of Hartzell's requests on the record with the State present despite Hartzell requesting an ex parte consideration of at least two of his requests. CrR 3.1(f)(2) states that a motion for investigative services "shall be made ex parte." While the trial court abused its discretion in failing to at least grant ex parte consideration for the two instances Hartzell requested to proceed ex parte, a ruling on investigative services "shall not be overturned absent a clear showing of substantial prejudice." *Young*, 125 Wn.2d at 691.

Here, Hartzell fails to show substantial prejudice. Hartzell's initial request for investigative funds contemplated assistance in developing his defense for the two felony crimes. Hartzell was found not guilty of both. Hartzell asserts that, although he prevailed on these charges, his defense was prejudiced by delays in securing witness information. But it is unclear how any delay in obtaining information from witnesses resulted from the State participating in the trial court's discussion of Hartzell's requests. Moreover, Hartzell stipulated to sending the

video and photos at issue in his disclosing intimate image conviction. Hartzell does not explain how the lack of an investigator would have substantially prejudiced him in defending against this conviction. Accordingly, Hartzell fails to make a clear showing of substantial prejudice and his arguments fail.

## CONCLUSION

We hold that (1) Hartzell's allegations regarding his return from Mexico is not a basis to reverse Hartzell's conviction or remand for an evidentiary hearing, (2) Hartzell fails to show that the State committed a *Brady* violation, and (3) although the trial court erred in considering Hartzell's requests for investigative funds on the record with the State present, Hartzell fails to show that the error substantially prejudiced his case. Accordingly, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Che, J.

We concur:

Lee, J.

Veljacic, C.J.